UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ACUMENTRICS CORPORATION **04** **12432 WGY**
Plaintiff )
)
)
v. )
) MAGISTRATE JUDGE C.A. No.
CONNECTICUT INNOVATIONS, )
INCORPORATED, CONNECTICUT )
DEVELOPMENT AUTHORITY, )
TOMASSO BROTHERS, INC., )
TUNXIS MANAGEMENT CO., )
ARTHUR DIETRICK, PETER ELLEF, )
and WILLIAM TOMASSO, )
Defendants )

RECEIPT #_____
AMOUNT $_____
SUMMONS ISSUED____
LOCAL RULE 4.1____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK._____
DATE_____

## COMPLAINT AND JURY DEMAND

### PARTIES

1.      The plaintiff, Acumentrics Corporation ("Acumentrics"), is a

Massachusetts corporation with a place of business at 20 Southwest Park, Westwood,

Massachusetts.

2.      Upon information and belief, the defendant, Connecticut Innovations,

Incorporated ("CII"), is a Connecticut corporation with a place of business at 999 West

Street, Rocky Hill, Connecticut.

3.      Upon information and belief, the defendant, Connecticut Development

Authority ("CDA"), is an authority of the State of Connecticut, with a place of business

at 999 West Street, Rocky Hill, Connecticut.

4.      Upon information and belief, the defendant, Tomasso Brothers, Inc.

("TBI"), was at all relevant times a Connecticut corporation.

1

5.    Upon information and belief, the defendant, Tunxis Management Co. ("Tunxis"), was at all relevant times a Connecticut corporation.

6.    Upon information and belief, the defendant Arthur Dietrick ("Dietrick"), is an individual residing in Connecticut and was at all relevant times an officer, director and/or agent of CDA.

7.    Upon information and belief, the defendant, Peter Ellef, is an individual residing in Connecticut and was at all relevant times an officer, director and/or agent of CII.

8.    Upon information and belief, the defendant, William Tomasso, is a resident of the State of Connecticut and a shareholder, officer and director of TBI and Tunxis.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331.

10.    Venue in this Court is proper pursuant to 28 U.S.C. §§1391(b) and (c).

## FACTS

11.    Acumentrics is a high-technology company that designs and manufactures power supply equipment, including durable fuel cells and uninterruptible power supply packs, and distributes them to customers and end users internationally. Acumentrics is thereby engaged in interstate and foreign commerce and Acumentrics' activities otherwise affect interstate and foreign commerce.

12.    CII is a quasi-public entity created by the Connecticut legislature for the purpose of fostering industrial and commercial development in Connecticut. Among other things, CII makes equity investments in emerging technology companies. CII is

2

thereby engaged in interstate or foreign commerce and CII's activities otherwise affect interstate or foreign commerce.

13.   TBI and Tunxis are entities through which Tomasso conducts business in various fields, including real estate development and management.

14.   Upon information and belief, in or about October 1997 through at least October 2003, Ellef, Tomasso, TBI, Tunxis, Dietrick and others knowingly and intentionally conspired to violate 18 U.S.C. § 1962 (c) of the RICO statute, that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of CII and CDA through a pattern of racketeering activity. More particularly, Ellef and Dietrick used their positions with CII and CDA to provide preferential treatment to benefit the financial interests of Tomasso, TBI and Tunxis, including influencing the award of governmental loans, grants, agreements and contracts and thereby causing payments to be made in order to benefit the financial interests of Tomasso, TBI and Tunxis, among others. Dietrich, Ellef and others would receive so-called "kickback" payments in the form of cash and other things of value from Tomasso, TBI and/or Tunxis for their participation in the conspiracy.

15.   Upon information and belief, as part of the defendants' racketeering conspiracy, Ellef identified Acumentrics as a possible means for disbursing public funds for the benefit of Tomasso, TBI and/or Tunxis.  More particularly, Ellef sought to induce Acumentrics to relocate its manufacturing facility to Connecticut with the promise of capital investment and public financing.  Unknown to Acumentrics, Ellef's underlying purpose in attempting to conclude such an agreement with Acumentrics was to cause

Acumentrics to enter into an above-market lease for a building owned, directly or indirectly, by Tomasso, TBI and/or Tunxis.

16.    On or about February 11, 2002, Ellef, Tomasso and others first met with Acumentrics in Massachusetts to discuss a $10 million financing package to induce Acumentrics to move its manufacturing facility to Connecticut. At this meeting, Ellef told Acumentrics that it must cease discussions with Massachusetts officials for any other financing if Acumentrics wished to negotiate such a deal with CII.

17.    On or about March 25, 2002 Acumentrics concluded negotiations with CII for a series of interrelated agreements whereby CII would make a capital investment in Acumentrics in the amount of $4 million (the "Purchase Agreement"), and purchase $3 million of Acumentrics fuel cells (the "Supplier Agreement"). Further, under the Purchase Agreement, CII covenanted that CDA would provide equipment financing in the amount of $3 million to Acumentrics (the "Finance Clause"). In exchange for all of the above, Acumentrics would relocate its manufacturing facility to Connecticut. (Collectively, each of the foregoing agreements are referred to herein as the "Agreements.")

18.    At the time Acumentrics began negotiations with the defendants, it held and derived income from a mortgage on a potential manufacturing facility located in Norwood, Massachusetts (the "Norwood Property"). As a condition of entering into the Agreements, Dietrick, CII, CDA and others required Acumentrics to divest itself of any interest in the Norwood Property. Acumentrics complied with this demand at substantial expense and at a time when the terms of such a sale were unfavorable to Acumentrics.

4

By divesting itself of any interest in the Norwood Property in unfavorable market conditions, Acumentrics gave up substantial capital gains and interest income.

19.    Pursuant to the Purchase Agreement, CII purchased 444,444 shares of Acumentrics class B common stock (the "Stock") in exchange for $4 million. The Purchase Agreement also gave CII the right to sell the Stock back to Acumentrics in the event of certain defaults at a price equal to the purchase price plus an additional 25% per year.

20.    On or about March 1, 2002, concurrent with the negotiation of the Agreements, Acumentrics entered into a letter of intent with TBI Construction Company, LLC, an affiliate or subsidiary of TBI and/or Tunxis also controlled by Tomasso, for negotiation of a lease of a building owned, directly or indirectly, by Tomasso, at an above-market rate.

21.    Shortly after execution of the Agreements, the defendants began to pressure Acumentrics into signing a lease for a commercial facility in Connecticut owned by Tomasso.

22.    In the course of lease negotiations, Tomasso persistently made commercially unreasonable demands of Acumentrics. By Summer 2002, it became clear that Acumentrics would be unable to come to an agreement with TBI, Tomasso or their related entities concerning a lease. In order to appease Tomasso and clear the way for lease negotiations with third parties, Acumentrics entered into a further agreement in or about September 2002 requiring Acumentrics to pay defendant Tunxis $200,000. On October 16, 2002, Acumentrics in fact paid Tunxis $20,000 to extend the payment terms of that agreement.

23.     Pursuant to the Supplier Agreement, some or all of the defendants caused CII to prepay Acumentrics $1.5 million (the "Prepayment") for fuel cell orders.

24.     Acumentrics eventually declined to lease Tomasso's building and instead entered into a lease (the "Lease") for an alternative facility not owned by Tomasso. In so doing Acumentrics was required to use almost all of the Prepayment to finance the down-payment on the Lease.

25.     Because Acumentrics was required to use the entire $1.5 million Prepayment for the Lease and for other cash flow needs, it required access to the $3 million line of credit of the Finance Clause in order to purchase the equipment necessary to produce the fuel cells that were the subject of the Supplier Agreement. Upon information and belief, Dietrick and other defendants were aware of Acumentrics' need for access to the line of credit.

26.     After Acumentrics refused to lease Tomasso's property, CDA, CII, and Dietrick refused to provide any part of the equipment financing contemplated by the Financing Clause on commercially reasonable terms, thereby preventing Acumentrics from being able to perform under the Agreements. Accordingly, Acumentrics was never able to purchase equipment necessary to fulfill orders under the Supplier Agreement or to establish a manufacturing facility at the property it had leased. In short, CII and CDA through Dietrick, Ellef and others had conspired with Tomasso to attempt to divert $1.5 million in public funds to the benefit of Tomasso, and froze Acumentrics out when it refused to act in accord with their plan.

27.     Acumentrics relied to its detriment on the Finance Clause and would not have entered into any one of the Agreements or the Lease without the defendants'

6

agreement that CDA would provide the entire $3 million line of credit to Acumentrics on commercially reasonable terms.

28.    Acumentrics was financially crippled as a result of its dealings with the defendants and began seeking additional investment or financing from third parties. CII was aware of Acumentrics' efforts in this regard, and on or about July 14, 2004 assured Acumentrics that CII would not seek to exercise its option to resell the Stock to Acumentrics.

29.    Shortly thereafter, knowing that such action would cripple Acumentrics' efforts to obtain necessary third party financing, CII without warning sought to exercise its right to resell the Stock on the ground that the Acumentrics had failed to relocate to Connecticut. Though CII had paid only $5.5 million to Acumentrics under the Agreements and has failed and refused to provide *any* funding required by the Finance Clause, the total amount demanded by CII exceeds $8.7 million.

30.    CII's right to resell the Stock, at an additional premium of 25% per year, is in substance an illegal debt bearing a usurious rate of interest.

31.    In September 23, 2004, Ellef, Tomasso, TBI, Tunxis and others were indicted by a federal grand jury sitting in the District of Connecticut for crimes such as racketeering, public corruption, mail fraud, wire fraud, extortion, conspiracy to money launder and conspiracy to defraud the IRS in connection with an ongoing scheme to divert public contracts to companies controlled by Tomasso and his family. (A true copy of the form of the indictment is attached hereto as "Exhibit A.") The defendants' actions set forth in this complaint served as one of many bases for the indictments. The acts that are the subject of the indictment constitute a pattern of racketeering activity. As such,

Dietrick, Ellef, Tomasso and others have conspired to and have conducted or participated in the conduct of the affairs of CII and CDA through a pattern of racketeering activity. In addition, the defendants have conspired to cause CII to acquire and maintain an interest in Acumentrics through a pattern of racketeering activity or the collection of an unlawful debt.

32.    Acumentrics has suffered both pecuniary and irreparable harm as a result of the defendants' racketeering activity and other wrongful conduct.

## COUNT I
## Civil Claim for Violation of 1962(b) of the Federal RICO Statute
## 18 U.S.C. §§1962, 1964

33.    The allegations set forth in paragraphs 1 through 32 of the Complaint are hereby incorporated by reference and made a part hereof.

34.    Each of the defendants are persons within the meaning of 18 U.S.C. §1961(3).

35.    Acumentrics constitutes an enterprise within the meaning of 18 U.S.C. §1961(4)

36.    The offenses for which Tomasso, Ellef, TBI and Tunxis have been indicted, including the ongoing scheme to divert public contracts and monies to entities controlled by Tomasso, constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(1) and (4).

37.    By inducing Acumentrics to enter into the Agreements for the purpose of diverting the Prepayment and/or other public money to benefit of Tomasso, and contriving to place Acumentrics in a position of being at the mercy of CII and other defendants, the defendants have caused CII to acquire and maintain an interest in and

8

control over Acumentrics through a pattern of racketeering activity in violation of 18

U.S.C. §1962(b).

38.    As a direct and proximate result of the defendants' violation of 18 U.S.C.

§1962(b), Acumentrics has suffered and will continue to suffer monetary and irreparable

harm.

**COUNT II**
**Civil Claim for Violation of 1962(c) of the Federal RICO Statute**
**18 U.S.C. §§1962, 1964**

39.    The allegations set forth in paragraphs 1 through 38 of the Complaint are

hereby incorporated by reference and made a part hereof.

40.    Each of the defendants are persons within the meaning of 18 U.S.C.

§1961(3).

41.    CII constitutes an enterprise within the meaning of 18 U.S.C. §1961(4).

42.    The offenses for which Tomasso, Ellef, TBI and Tunxis have been

indicted, including the ongoing scheme to divert public contracts and monies to Tomasso

and entities controlled by Tomasso, constitute a pattern of racketeering activity within the

meaning of 18 U.S.C. §1961(1) and (4).

43.    By using CII to induce Acumentrics to enter into the Agreements for the

purpose of diverting CII's Prepayment to benefit of Tomasso, the defendants have

caused, conducted or participated in the conduct of CII's affairs through a pattern of

racketeering activity in violation of 18 U.S.C. §1962(c).

44.    As a direct and proximate result of the defendants' violation of 18 U.S.C.

§1962(b), Acumentrics has suffered and will continue to suffer monetary and irreparable

harm.

## COUNT III
### Breach of Contract

45.    The allegations set forth in paragraphs 1 through 44 of the Complaint are hereby incorporated by reference and made a part hereof.

46.    Acumentrics entered into each of the Agreements due to the agreement that CII, though CDA, would provide the full $3 million line of credit under the Finance Clause. CII and the other defendants were fully aware that Acumentrics would be relying on this line of credit in establishing and occupying a manufacturing facility in Connecticut pursuant to the Purchase Agreement and in producing goods pursuant to the Supplier Agreement.

47.    CII and the other defendants breached the Agreements by failing and refusing to supply the $3 million line of credit to Acumentrics contemplated by the Agreements as a whole and the Finance Clause in particular.

48.    By their breach, CII and the other defendants prevented Acumentrics from establishing and occupying a facility in Connecticut and from fulfilling product orders.

49.    In addition, CII and the other defendants have engaged in numerous breaches of the implied covenant of good faith and fair dealing by: (a) fraudulently inducing Acumentrics to enter into the Agreements for the purpose of attempting to use Acumentrics to divert public funds to Tomasso and others; (b) inducing Acumentrics to enter into a lease for a manufacturing facility in Connecticut while putting Acumentrics in a position of being unable to relocate to Connecticut and fulfill orders and then using that circumstance to declare a default and seek resale of the Stock to Acumentrics at a confiscatory premium; and (c) using the exercise of the right to resell the Stock at a time

calculated to impede Acumentrics' efforts to solicit third party investment and/or to gain

an unfair advantage in the context of Acumentrics' refinancing.

50.    Acumentrics has suffered and will continue to suffer both monetary and

irreparable harm as a result of the defendants' breaches of contract.

## COUNT IV
### Usury
### M.G.L. ch. 271 §49(a)

50.    The allegations set forth in paragraphs 1 through 49 of the Complaint are

hereby incorporated by reference and made a part hereof.

51.    CII's right to resell the Stock at an additional premium of 25% per year is

in substance an illegal debt bearing a usurious rate of interest, viz., 25%.

52.    Efforts by CII and other defendants to exercise the right of resale of the

Stock to Acumentrics constitute an illegal attempt to collect usurious interest.

53.    Upon information and belief CII has neither notified or provided the

Attorney General of the Commonwealth of Massachusetts any record of its purported

right to resell the Stock pursuant to M.G.L. ch. 271 §49(d).

54.    Acumentrics has suffered and will continue to suffer both monetary and

irreparable harm as a result of the defendants' violation of the usury statute.

## COUNT V
### Fraud/Misrepresentation

55.    Plaintiff repeats and incorporates by reference the allegations of

Paragraphs 1 through 54 as if specifically set forth herein.

56.    Dietrick and the other defendants fraudulently represented to Acumentrics

that they would enter into the Agreements for the legal purposes consistent with the

stated mission of CII and would honor the Agreements (the "Statements").  The

11

Defendants' actual purpose in entering into the Agreements with Acumentrics was to attempt to continue their ongoing racketeering activity, namely, diverting public money and contracts to Tomasso. The defendants' purpose in making the Statements was to induce Acumentrics to enter into and perform the Agreements.

57.     The Statements were false and fraudulent when made.  The defendants knew or should have known that the Statements were false and fraudulent when made.

58.     Acumentrics relied on the Statements in entering into and performing the Agreements, entering into a lease for a manufacturing facility in Connecticut and disbursing $1.5 million to lease same.

59.     Acumentrics has suffered harm as a result of entering into and performing the Agreements and undertaking other obligations in reliance on the Statements.

## COUNT VI
### Unfair Competition and Deceptive Trade Practices
### (M.G.L. ch. 93A)

60.     The allegations set forth in paragraphs 1 through 59 of the Complaint are hereby incorporated by reference and made a part hereof.

61.     The totality of the defendants' actions constitute unfair or deceptive acts in the conduct of trade or commerce in violation of M.G.L..ch. 93A §§ 2(a) and 11.

62.     The defendants committed such unfair or deceptive acts willfully and knowingly.

63.     The defendants' actions were directed at a Massachusetts corporation and were calculated in part to cause Acumentrics to move substantial assets out of the Commonwealth and into Connecticut.  Therefore, the defendants' actions had their primary impact substantially and primarily within the Commonwealth of Massachusetts.

64.    Acumentrics has suffered and will continue to suffer both monetary and irreparable harm as a result of the defendants' unfair and descriptive trade practices.

WHEREFORE, plaintiff Acumentrics Corporation hereby requests that this Honorable Court:

1.    Enter Judgment in favor of the plaintiff and against the defendants on Counts I through VI of the Complaint;

2.    Award the plaintiff its damages, including triple damages pursuant to 18 U.S.C. §1964(c) and M.G.L. c. 93A;

3.    Order the cancellation of the Stock held by CII as an equitable remedy pursuant to 18 U.S.C. §1964 (a);

4.    Award rescission of the Agreements in favor of Acumentrics;

5.    Declare any purported right of CII to resell the Stock to Acumentrics void pursuant to M.G.L. ch. 271, § 49(c);

6.    Award the plaintiff its costs, interest, and attorneys' fees pursuant to 18 U.S.C. §1964(c) and M.G.L. c. 93A; and

7.    Award the plaintiff such other relief as the Court deems just.

**JURY DEMAND**

Plaintiff, Acumentrics Corporation, demands a trial by jury on all issues so

triable.

Respectfully submitted,

ACUMENTRICS CORPORATION
By its attorneys,

Robert R. Pierce (BBO#549172)
Christopher D. Engebretson (BBO#635636)
Pierce & Mandell, P.C.
11 Beacon Street
Boston, MA 02108
(617) 720-2444

November 17, 2004

14

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | | |
| v. | : | CRIMINAL NO. _____ |
| | | |
| PETER N. ELLEF, | : | VIOLATIONS: |
| WILLIAM A. TOMASSO, | | Racketeering Conspiracy |
| TOMASSO BROTHERS, INC., | : | (18 U.S.C. § 1962(d)); |
| TUNXIS MANAGEMENT CO., | | Racketeering |
| PETER N. ELLEF II, and | : | (18 U.S.C. § 1962(c)); |
| LF DESIGN, LLC | : | Conspiracy To Commit Bribery Concerning |
| | | Programs Receiving Federal Funds |
| | : | (18 U.S.C. § 371); |
| | | Mail/Wire Fraud/Theft of Honest Services |
| | : | (18 U.S.C. §§ 1341, 1343 & 1346); |
| | | Extortion |
| | : | (18 U.S.C. § 1951); |
| | | Conspiracy To Money Launder |
| | : | (18 U.S.C. § 1956(h)); |
| | | Conspiracy to Defraud the IRS |
| | : | (18 U.S.C. § 371) |

INDICTMENT

The Grand Jury Charges:

## COUNT ONE - Racketeering Conspiracy
(18 U.S.C. § 1962(d))
(Peter N. Ellef, William A. Tomasso, Tomasso Brothers, Inc.,
Tunxis Management Co., Peter N. Ellef II, LF Design, LLC)

1. At all times relevant to this Indictment, under Connecticut law, the supreme executive power of the state was vested in the Governor who, through the Office of the Governor, had the authority and responsibility to appoint department commissioners and key administrators; approve and veto legislation; set the agenda for the Bond Commission; authorize expenditures for certain emergency state work; and otherwise set priorities and direction for the State of Connecticut.

2. At all times relevant to this Indictment, the State of Connecticut received benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance in a one year period.

3. Defendant PETER N. ELLEF ("ELLEF"), a resident of the State of Connecticut, was Co-Chief of Staff to the Governor of Connecticut from about October 1997 through March 2002. As Co-Chief of Staff to the Governor of Connecticut, defendant ELLEF owed a duty of loyalty and honest services to the State of Connecticut and its citizens in the performance of his public duties, free from deceit, favoritism, bias, conflict of interest, and self-enrichment. By appointment of the Governor, defendant ELLEF was also (1) Chairman of the Connecticut Resources Recovery Authority ("CRRA") from approximately February 1997 to March 2002 and (2) Commissioner of the Connecticut Department of Economic and Community Development from about August 1995 to October 1997.

4. As Co-Chief of Staff to the Governor, defendant ELLEF acted at times as the liaison between the Office of the Governor and various state and quasi-public agencies, including the Department of Public Works ("DPW"), the Department of Economic and Community Development ("DECD"), the Department of Children and Families ("DCF"), and the Connecticut Lottery Corporation ("CLC").

5. At all times relevant to this Indictment, the Commissioners of DPW, DECD, and DCF were appointed by the Governor, served at the pleasure of the Governor, and reported to the Governor's Office. At all times relevant to this Indictment, the CLC was governed by a board of directors, the Chairman of which was appointed by the Governor and served at his pleasure.

-2-

6. At all times relevant to this Indictment, defendant ELLEF was an "agent" of "state government" as those terms are defined by Title 18, United States Code, Sections 666(d)(1) and 666(d)(3); a "public servant" as that term is defined by Connecticut General Statutes § 53a-146k; and a "public official" as that term is defined by Connecticut General Statues §1-79(k).

7. At all times relevant to this Indictment, defendant WILLIAM A. TOMASSO ("TOMASSO"), a resident of the State of Connecticut, was an officer of defendant TOMASSO BROTHERS, INC.; the co-founder and president of defendant TUNXIS MANAGEMENT CO.; and an owner and director of a Connecticut company ("Company T").

8. At all times relevant to this Indictment, defendant TOMASSO BROTHERS, INC. ("TBI") was a private entity organized and existing under the laws of the State of Connecticut with its principal place of business in New Britain, Connecticut.

9. At all times relevant to this Indictment, defendant TUNXIS MANAGEMENT CO. ("TUNXIS"), a private entity organized and existing under the laws of the State of Connecticut, was a real estate management company with its principal place of business in New Britain, Connecticut.

10. At all times relevant to this Indictment, defendant LF DESIGN, LLC ("LF DESIGN"), a private entity organized and existing under the laws of the State of Connecticut, was a landscape design and snow-removal company.

11. At all times relevant to this Indictment, defendant PETER N. ELLEF II ("ELLEF II"), a resident of the State of Connecticut, was principal owner and president of defendant LF DESIGN and defendant ELLEF's son.

12. At all times relevant to this Indictment, defendant ELLEF II was a 95% owner and defendant ELLEF's wife was a 5% owner of defendant LF DESIGN.

13. Lawrence E. Alibozek ("Alibozek"), not named as a defendant herein, was Deputy Chief of Staff to the Governor of Connecticut from about October 1997 to July 1999. From about September 1996 to October 1997, Alibozek was a durational project manager and a Deputy Commissioner at DECD.

14. From approximately July 1999 through December 1999, TREA, LLC ("TREA"), not named as a defendant herein, a private entity organized and existing under the laws of the State of Connecticut, was formed for the benefit of defendant ELLEF and Alibozek.

15. At all times relevant to this Indictment, Company T, not named as a defendant herein, was a private entity organized and existing under the laws of the State of Connecticut with its principal place of business in New Britain, Connecticut.

16. Pursuant to the State of Connecticut Code of Ethics for Public Officials, defendant ELLEF was prohibited from knowingly accepting, directly or indirectly, a gift from any person he knew was doing or seeking to do business with or engaged in activities regulated by the Office of the Governor and was prohibited from using his public office, or any confidential information received through holding such public office, to obtain financial gain for himself, his spouse, his children or a business with which he was associated.

17. Pursuant to the State of Connecticut Code of Ethics for Public Officials, defendant ELLEF was required to file an Annual Statement of Financial Interests wherein he was required to disclose, under criminal penalty of false statement, both (a) the names of all businesses with

-4-

which he or his immediate family were associated and (b) the category or type of all income in excess of $1,000.

18. Pursuant to the State of Connecticut Code of Ethics for Public Officials, defendant TOMASSO, as a person doing business and seeking to do business with the Office of the Governor and the departments and agencies it regulated, was prohibited from knowingly giving, directly or indirectly, any gift to public officials in the Governor's Office and was also prohibited from giving a public official or his family anything of value based on any understanding that the official action or judgment of the public official would be or had been influenced thereby.

## The Enterprise

19. At all times relevant to this Indictment, in the District of Connecticut and elsewhere, the Office of the Governor constituted an enterprise (the "Enterprise") as that term is defined in Title 18, United States Code, § 1961(4), which was engaged in, and the activities of which affected, interstate commerce.

## Objectives Of The Racketeering Activity

20. It was the objective of defendants ELLEF, TOMASSO, TBI, TUNXIS, ELLEF II and LF DESIGN and others to conduct the business and affairs of the Enterprise through a pattern of criminal activity consisting of violations of the laws of the United States and the State of Connecticut for the personal, pecuniary and political benefit of defendants and persons associated with defendants and to conceal defendant ELLEF's participation in and enrichment from the criminal activity.

-5-

## The Racketeering Conspiracy

21. From in or about October 1997 through at least October 2003, both dates being approximate and inclusive, within the District of Connecticut and elsewhere, defendants, ELLEF, TOMASSO, TBI, TUNXIS, ELLEF II and LF DESIGN, together with Alibozek and other persons, known and unknown to the Grand Jury, being persons employed by and associated with the Enterprise, that is the Office of the Governor, which Enterprise was engaged in, and the activities of which affected, interstate commerce, knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that Enterprise through a pattern of racketeering activity, as that term is defined in Sections 1961(1) and 1961(5) of Title 18, United States Code, consisting of:

   A. Multiple acts involving bribery chargeable under the following provisions of state law:

        1. Conn. Gen. Stat.§ 53a-147 (bribery)
        2. Conn. Gen. Stat.§ 53a-148 (bribe receiving); and

   B. Multiple acts indictable under the following provisions of federal law:

        1. 18 U.S.C. § 1341, § 1343 and § 1346 (mail/wire fraud/theft of honest services)
        2. 18 U.S.C. § 1951 (extortion)
        3. 18 U.S.C. § 1956 (money laundering)

   It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## Manner And Means Of The Defendants

It was part of the manner and means of the defendants ELLEF, TOMASSO, TBI, TUNXIS, ELLEF II and LF DESIGN, as well as others, that:

22. Defendants TOMASSO, TBI, and TUNXIS, as well as others agreed to pay bribes, rewards and gratuities to defendants ELLEF, ELLEF II, and LF DESIGN, as well as Alibozek and others, including but not limited to persons in whose welfare defendant ELLEF had an interest, for, because of and in consideration for favorable and preferential treatment in connection with official State of Connecticut business by defendant ELLEF, Alibozek and other members and associates of the Enterprise.

23. Defendants ELLEF, ELLEF II, and LF DESIGN, as well as Alibozek and other persons in whose welfare defendant ELLEF had an interest, received personal and financial benefits from defendants TOMASSO, TBI and TUNXIS while defendants ELLEF, ELLEF II and LF DESIGN knew that such benefits were provided with the intent to influence and reward defendant ELLEF and others in the performance of official acts. Such benefits included, but were not limited to, the following:

      (i)     Cash payments to defendant ELLEF and Alibozek;

      (ii)    Gold coins to defendant ELLEF and Alibozek;

      (iii)   Meals, lodging, limousine services and vacation benefits to defendants ELLEF, ELLEF II, defendant ELLEF's family, Alibozek and persons in whose welfare defendant ELLEF and others had an interest;

      (iv)   Start-up and other costs for TREA to benefit defendant ELLEF and Alibozek;

      (v)    Substantial business and contracts, including cash advances, to ELLEF II and LF DESIGN;

-7-

       (vi)     Consulting payments to defendant LF DESIGN to cover the costs
                associated with the development of a business to benefit defendants
                ELLEF, ELLEF II and LF DESIGN; and

       (vii)   Free rent to defendants ELLEF II and LF DESIGN.

24. Defendant ELLEF and Alibozek used their official positions to provide preferential

treatment to, as well as to perform, direct and authorize official actions to benefit the financial

interests of, defendants TOMASSO, TBI, TUNXIS, and other individuals and businesses. The

official actions that defendant ELLEF and Alibozek performed, directed and authorized

included:

       (i)      Influencing and attempting to influence the award of loans, grants,
                agreements and contracts, as well as intervening in state governmental
                processes related thereto and thereby causing payments to be made, in
                order to benefit the financial interests of defendants TOMASSO, TBI,
                TUNXIS, and other individuals and businesses.

       (ii)     Providing defendants TOMASSO, TBI, TUNXIS, and certain associates
                with participatory status in, and material non-public information relating
                to, state governmental activity and decisions, which defendants
                TOMASSO, TBI and TUNXIS, and certain associates converted into
                financial benefits for themselves and other individuals and businesses.

25. Defendant ELLEF used the authority of his official position within the Office of the

Governor to create an atmosphere of intimidation within state government so that other state

officials and employees would comply with his requests, orders, and directions.

26. Defendants ELLEF, TOMASSO, TBI, TUNXIS, ELLEF II and LF DESIGN, as well

as other co-conspirators, engaged in schemes to defraud the State of Connecticut and its citizens

of the intangible right to the honest services of defendant ELLEF and other state officials by

means of materially false and fraudulent pretenses, representations, promises and material

omissions and caused the use of the Unites States mails and interstate wires, as more fully
described in paragraphs 11 through 87 of Count Two.

27.  Defendants ELLEF and TOMASSO used defendant ELLEF's official position and
influence to extort and attempt to extort property from individuals and businesses seeking to do
business with the State of Connecticut, which extortion obstructed, delayed and affected
commerce, as more fully set forth in paragraphs 88 through 95 of Count Two.

28.  Defendants ELLEF, TOMASSO, ELLEF II, and LF DESIGN conspired to conduct
financial transactions designed in whole or in part to conceal and disguise the nature, location,
source, ownership, and control of the proceeds of specified unlawful activity, as more fully set
forth in paragraphs 96 through 107 of Count Two.

29.  Defendant ELLEF abused his position as Chairman of CRRA by having CRRA pay
for personal expenses that defendant ELLEF charged to an American Express card issued to him
by CRRA.

30.  Defendants ELLEF, TOMASSO, TBI, TUNXIS, ELLEF II and LF DESIGN
concealed their participation in and enrichment from the criminal activity by, among other
things:

  (i)   Defendant ELLEF failing to disclose financial benefits and other things of
        value he received from defendants TOMASSO, TBI and TUNXIS, as
        required by law and policy;

  (ii)  Defendants ELLEF and TOMASSO together with Alibozek organizing
        TREA in such a way as to conceal the fact that defendant ELLEF had a
        financial interest in the entity;

  (iii) Defendant ELLEF failing to disclose his association with TREA on his
        Annual Statement of Financial Interests with the State of Connecticut
        Ethics Commission; and

> (iv)   Defendant ELLEF failing to disclose fully his association with, and
>        financial benefits derived from, defendant LF DESIGN on his Annual
>        Statement of Financial Interests with the State of Connecticut Ethics
>        Commission.

All in violation of Title 18, United States Code, Section 1962(d).

### COUNT TWO - Racketeering
(18 U.S.C. § 1962(c))
(Peter N. Ellef, William A. Tomasso, Tomasso Brothers, Inc.,
Tunxis Management Co., Peter N. Ellef II, and LF Design, LLC)

1.  Paragraphs 1-20 and 22-30 of Count One of this Indictment are realleged and

incorporated by reference as though fully set forth herein.

### The Racketeering Violation

2.  From in or about October 1997 to at least October 2003,  both dates being

approximate and inclusive, in the District of Connecticut and elsewhere, defendants ELLEF,

TOMASSO, TBI, TUNXIS, ELLEF II, and LF DESIGN, together with Alibozek and others

known and unknown to the Grand Jury, being persons employed by and associated with the

Enterprise, that is the Office of the Governor, which Enterprise was engaged in, and the activities

of which affected, interstate commerce, unlawfully and knowingly conducted and participated,

directly and indirectly, in the conduct of the affairs of that Enterprise through a pattern of

racketeering activity, that is, through the commission of Racketeering Acts 1 - 8, as set forth

below.

### The Pattern Of Racketeering Activity

3.  The pattern of racketeering activity as defined in Title 18, United States Code,

§§ 1961(1) and 1961(5), consisted of the following acts:

**Racketeering Act 1- Conspiracy To Commit Bribe Receiving and Bribery**
(Peter N. Ellef, William A. Tomasso, TBI, Tunxis, Peter N. Ellef II, and LF Design)

4.  Paragraphs 1-18, 22-25 and 30 of Count One of this Indictment are realleged and

incorporated by reference as though fully set forth herein.

5.  At all times material to this Indictment, there was in full force and effect a criminal

statute of the State of Connecticut at Conn. Gen. Stat. § 53a-148, which provided as follows:

> A public servant or person selected to be a public servant is guilty of bribe
> receiving if he solicits, accepts or agrees to accept from another person
> any benefit for, because of, or as consideration for his decision, opinion,
> recommendation or vote.

6.  At all times material to this Indictment, there was in full force and effect a criminal

statute of the State of Connecticut at Conn. Gen. Stat. § 53a-147, which provided as follows:

> A person is guilty of bribery if he promises, offers, confers, or
> agrees to confer upon a public servant or a person selected to be a
> public servant any benefit as consideration for the recipient's
> decision, opinion, recommendation or vote as a public servant or a
> person selected to be a public servant.

7.  At all times material to this Indictment, Conn. Gen. Stat. § 53a-146 defined the terms

"Benefit" and "Public Servant" as follows:

> "Benefit" means monetary advantage, or anything regarded by the
> beneficiary as a monetary advantage, including a benefit to any
> person or entity in whose welfare he is interested.
>
> "Public Servant" is an officer or employee of government, elected
> or appointed, and any person participating as advisor, consultant or
> otherwise, paid or unpaid, in performing a governmental function.

8.  At all times material to this Indictment, there was in full force and effect a criminal

statute of the State of Connecticut at Conn. Gen. Stat. § 53a-48, which provided as

follows:

-11-

A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct and any one of them commits an overt act in pursuance of such conspiracy.

9. Between October 1997 and April 2002, approximately, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, TBI, and TUNXIS, aided and abetted by ELLEF II and LF DESIGN, together with Alibozek and other individuals, known and unknown to the Grand Jury, did unlawfully, willfully and knowingly conspire, combine, confederate and agree together and with each other to commit certain offenses as follows:

(a)     For defendant ELLEF, aided and abetted by ELLEF II, LF DESIGN, together with Alibozek and others, known and unknown to the Grand Jury, to solicit, accept, and agree to accept benefits from defendants TOMASSO, TBI and TUNXIS, for, because of and as consideration for defendant ELLEF's decisions, opinions and recommendations, and votes in connection with the award and attempted award of loans, grants and contracts, in violation of Conn. Gen. Stat. 53a-148 and 8; and

(b)     For defendants TOMASSO, TBI, and TUNXIS to promise, offer, confer, or agree to confer upon defendants ELLEF, ELLEF II, LF DESIGN, as well as Alibozek and others in whose welfare defendant ELLEF and others had an interest, benefits as consideration for defendant ELLEF's decisions, opinions, recommendations and votes in connection with the award and attempted award of loans, grants and contracts, in violation of Conn. Gen. Stat. 53a-147 and 8.

## Overt Acts

10. In furtherance of the conspiracy and to effect the objects thereof, defendants ELLEF, TOMASSO, TBI, and TUNXIS, aided and abetted by defendants ELLEF II and LF DESIGN, together with Alibozek and others, known and unknown to the Grand Jury, committed and caused others to commit the following overt acts, among others, in the District of Connecticut and elsewhere:

In or about October 1997, defendant LF DESIGN is formed.

-12-

Between in or about January 1998 and April 2002, defendants TOMASSO, TBI
TUNXIS and Tomasso related entities provided business in the amount of approximately
$1.6 million to defendants ELLEF II and LF DESIGN.

On or about January 7, 1998, defendant ELLEF requested that DECD immediately
process a request to provide Company T a grant for market analysis and development.

On or about March 7, 1998, defendants ELLEF and TOMASSO, accompanied by
Alibozek and other state officials and employees, inspected the CLC headquarters after a
multiple homicide. Defendant ELLEF directed that defendant TUNXIS perform the
necessary clean-up.

On or about October 16, 1998, defendants ELLEF, TOMASSO, as well as Alibozek and
others in whose welfare defendant ELLEF and others had an interest, traveled by
limousine, paid for by defendant TOMASSO, to New York State for a $566.32 dinner.

On or about October 26, 1998, defendants ELLEF and TOMASSO, accompanied by
Alibozek and other state officials and employees, toured Long Lane School in
Middletown, CT.

Between on or about November 22-24, 1998, defendants ELLEF and TOMASSO,
accompanied by Alibozek and other state officials and employees, traveled to Ohio to
view models for a new Connecticut Juvenile Training School ("CJTS").

On or about December 30-31, 1998, defendants ELLEF and TOMASSO, together with
Alibozek and others, traveled by limousine, at a cost of $1,885.77 paid by defendant TBI,
for an overnight in Boston, Massachusetts.

On or about April 23, 1999, with the knowledge of defendant ELLEF, defendants
TOMASSO and TBI interviewed with a state panel for selection as CJTS construction
manager.

Between on or about May 11-12, 1999, defendant ELLEF and Alibozek, together with
third parties in whose welfare defendant ELLEF and others had an interest, traveled by
limousine, at a cost of $1,884.75 paid by defendant TBI, for an overnight in New York
City.

In or about July 1999, defendant TOMASSO provided gold to both defendant ELLEF
and Alibozek.

On or about September 28, 1999, defendant TBI signed a contract providing for the
payment of a $3.3 million construction management fee for CJTS.

Between in or about September 1999 and October 1999, defendants TOMASSO and TBI paid TREA $86,500.

Between in or about January 2000 and April 2002, defendants TOMASSO and TBI provided "consulting" payments in the amount of approximately $202,500.00 to defendants ELLEF II and LF DESIGN.

Between in or about January 2000 and April 2002, defendants TOMASSO and TBI made rent payments totaling approximately $18,760.16 for the office of defendant LF DESIGN.

In approximately July 2000, defendants ELLEF and TOMASSO met with the CEO and president of a New Jersey Company, identified as Company C, at the State Capitol.

In or about early August 2001, defendant TBI and an affiliated company issued two checks totaling $3,030.40 for limousine expenses incurred for defendant ELLEF II's wedding.

On or about February 11, 2002, defendants ELLEF, TOMASSO and others travel to Massachusetts to attend a meeting with representatives of a fuel cell company, identified as Company A.

All in violation of Conn. Gen. Stat. §§ 53a-48 and 8.

### Racketeering Acts 2A through 2C – Mail Fraud/Theft of Honest Services
(Peter N. Ellef, William A. Tomasso, Peter N. Ellef II and LF Design)

11. Paragraphs 1-18, 22-25 and 30 of Count One of this Indictment are realleged and

incorporated by reference as though fully set forth herein.

12. Defendants ELLEF, TOMASSO, ELLEF II, and LF DESIGN committed the

following acts, any one of which alone constitutes Racketeering Act 2.

### The Scheme And Artifice To Defraud

13. Beginning in approximately October 1997 and continuing to about August 2000, in

the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, ELLEF II and LF

DESIGN, and others known and unknown to the Grand Jury, in the District of Connecticut and

elsewhere, devised and intended to devise, and participated in, a scheme and artifice to defraud

-14-

the State of Connecticut and its citizens of the intangible right to the honest services of defendant

ELLEF and other officials and employees of the State of Connecticut, performed free from

deceit, favoritism, bias, conflict of interest and self-enrichment, in that the defendants used

defendant ELLEF's position as Co-Chief of Staff in the Governor's Office to enrich themselves

in connection with the award and attempted award of grants and low-interest loans to Company

T, with the intent to deceive the State of Connecticut and its citizens, accompanied by material

misrepresentations and omissions.

### Manner And Means Of The Scheme

The manner and means by which the scheme was sought to be accomplished included,

among others, the following:

14.  It was part of the scheme and artifice to defraud that on or about December 31, 1997,

Company T submitted a Pre-Application to DECD seeking $5 million in financial assistance

from DECD as part of the capital necessary to construct a manufacturing facility to assemble and

distribute electric scooters.

15.  It was further part of the scheme and artifice to defraud that on or about January 9,

1998, with the knowledge and at the direction of defendant ELLEF, the Commissioner of DECD

sent a package to the Office of the Governor which included a letter to the Governor seeking

approval for a $200,000 allotment to provide a grant to Company T for market analysis and

development and a memorandum to the Secretary of OPM stating that the request for approval

needed to be processed immediately per defendant ELLEF.

16. It was further part of the scheme and artifice to defraud that on or about January 30, 1998, the Bond Commission approved a January 2, 1998 request from DECD for the reallocation of $2.125 million in grant funds and a $3.175 million loan for the benefit of Company T.

17. It was further part of the scheme and artifice to defraud that between on or about February 1998 and June 1999, DECD officials, with the knowledge and at the direction of defendant ELLEF, negotiated the terms of the financial package to Company T.

18. It was further part of the scheme and artifice to defraud that between approximately March 1998 and September 1998, defendant ELLEF attempted to use his position as Co-Chief of Staff to the Governor to take and direct official actions to benefit Company T in connection with a proposed business venture with a Chinese company.

19. It was further part of the scheme and artifice to defraud that on or about July 27, 1999, the State Comptroller issued a check in the amount of $3.175 million to a joint venture formed by Company T to manufacture and distribute water treatment products and systems.

20. It was further part of the scheme and artifice to defraud that on or about July 29, 1999, the City of New Britain was provided with $2.125 million in DECD grant money, a substantial portion of which went to defendant TBI to build Company T's facility.

21. It was further part of the scheme and artifice to defraud that between approximately June and August 2000, Company T and defendant TBI paid defendant LF DESIGN approximately $56,395.00 for landscaping at Company T's facility.

22. It was further part of the scheme and artifice to defraud that defendant ELLEF influenced the award of the financial assistance package to Company T, and intervened in state

-16-

governmental processes related thereto and thereby caused payments to be made to benefit Company T and the interests of defendant TOMASSO and his family.

23. It was further part of the scheme and artifice to defraud that defendants ELLEF, ELLEF II and LF DESIGN and certain third persons in whose welfare defendant ELLEF and others had an interest received, and would continue to receive, personal and financial benefits from defendants TOMASSO, TBI and TUNXIS, knowing that such benefits were provided with the intent to influence and reward defendant ELLEF in connection with the award of a $5.5 million financial assistance package from DECD to Company T and attempts made by defendant ELLEF to benefit Company T in relation to a proposed business venture with a Chinese company.

24. It was further part of the scheme and artifice to defraud that defendant ELLEF performed and authorized official actions to benefit Company T and thereby the interests of defendant TOMASSO, and his family, without disclosing the personal and financial benefits and other things of value provided and to be provided to him and others in whose welfare defendant ELLEF had an interest by defendants TOMASSO, TBI and TUNXIS.

### Use Of the United States Mail

25. For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, ELLEF II and LF DESIGN, and others, did knowingly cause to be placed in an authorized depository for mail matter the following:

| ACT | DATE | USE OF UNITED STATES MAIL |
|-----|------|---------------------------|
| 2A | 1/4/99 | Letter from Company T to Deputy Commissioner of DECD |

| 2B | 6/5/00 | Invoice #1814 from defendant LF DESIGN |
| 2C | 7/5/00 | Invoice #1857 from defendant LF DESIGN |

In violation of Title 18, United States Code, Sections 1341, 1346, and 2.

### Racketeering Acts 3A through 3C – Mail Fraud/Theft of Honest Services
(Peter N. Ellef, William A. Tomasso, and Tunxis )

26. Paragraphs 1-18, 22-25 and 30 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

27. Defendants ELLEF, TOMASSO and TUNXIS committed the following acts, any one of which alone constitutes Racketeering Act 3.

### The Scheme And Artifice To Defraud

28. Beginning in approximately March 1998 and continuing to about October 2000, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, and TUNXIS, together with Alibozek and others, known and unknown to the Grand Jury, in the District of Connecticut and elsewhere, devised and intended to devise, and participated in, a scheme and artifice to defraud the State of Connecticut and its citizens of the intangible right to the honest services of defendant ELLEF and other officials and employees of the State of Connecticut, performed free from deceit, favoritism, bias, conflict of interest and self-enrichment, in that the defendants used defendant ELLEF's position as Co-Chief of Staff in the Governor's Office to enrich themselves in connection with the work performed for and contracts awarded by the Connecticut Lottery Corporation ("CLC"), with the intent to deceive the State of Connecticut and its citizens, accompanied by material misrepresentations and omissions.

### Manner And Means Of The Scheme

-18-

The manner and means by which the scheme was sought to be accomplished included, among others, the following:

29. It was part of the scheme and artifice to defraud that on or about March 7, 1998, defendants ELLEF and TOMASSO, together with Alibozek and other state employees and officials, toured CLC headquarters after a multiple homicide.

30. It was further part of the scheme and artifice to defraud that defendant TUNXIS, with the knowledge and at the direction of defendant ELLEF, performed the clean up of CLC headquarters in Newington, Connecticut.

31. It was further part of the scheme and artifice to defraud that on or about March 31, 1998, with the knowledge and at the direction of defendant ELLEF, CLC entered into a representation agreement with defendant TUNXIS to act as broker to locate new office space for CLC headquarters.

32. It was further part of the scheme and artifice to defraud that defendant ELLEF's actions in directing CLC to use defendant TUNXIS caused CLC to enter into additional contracts with defendants TOMASSO and TUNXIS.

33. It was further part of the scheme and artifice to defraud that on or about July 27, 1998, CLC and defendant TUNXIS entered into a construction management contract to renovate an office building to serve as CLC's new headquarters.

34. It was further part of the scheme and artifice to defraud that between approximately May 1998 and October 2000, CLC paid defendant TUNXIS approximately $216,892.31.

35. It was further part of the scheme and artifice to defraud that defendant ELLEF influenced the award of the contracts between CLC and defendant TUNXIS, and intervened in

-19-

state governmental processes related thereto and thereby caused payments to be made, to benefit
defendant TUNXIS and the financial interests of defendant TOMASSO and his family.

36. It was further part of the scheme and artifice to defraud that defendant ELLEF as
well as Alibozek and certain third persons in whose welfare defendant ELLEF and others had an
interest received, and would continue to receive, personal and financial benefits from defendants
TOMASSO, TBI and TUNXIS, knowing that such benefits were provided with the intent to
influence and reward defendant ELLEF in connection with contracts between defendants
TOMASSO and TUNXIS and CLC.

37. It was further part of the scheme and artifice to defraud that defendant ELLEF
performed and authorized official actions to benefit defendants TOMASSO and TUNXIS
without disclosing the personal and financial benefits and other things of value provided and to
be provided to him and others in whose welfare defendant ELLEF had an interest by defendants
TOMASSO, TBI and TUNXIS.

### Use Of the United States Mail

38. For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, and TUNXIS and others, did knowingly cause to be placed in an authorized depository for mail matter the following:

| ACT | DATE | USE OF UNITED STATES MAIL |
|------|--------|----------------------------|
| 3A | 5/7/98 | Letter from CLC to defendant TUNXIS, including payment of $61,397.98 |
| 3B | 8/11/98 | Payment of $28,480.00 from CLC to defendant TUNXIS |
| 3C | 1/8/99 | Payment of $32,040.00 from CLC to defendant TUNXIS |

In violation of Title 18, United States Code, Sections 1341, 1346, and 2.

### Racketeering Acts 4A through 4D – Mail Fraud/Theft of Honest Services
(Peter N. Ellef, William A. Tomasso, and Tunxis)

39. Paragraphs 1-18, 22-25 and 30 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

40. Defendants ELLEF, TOMASSO, and TUNXIS committed the following acts, any one of which alone constitutes Racketeering Act 4.

### The Scheme And Artifice To Defraud

41. Beginning in approximately October 1998 and continuing to about November 1999, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, and TUNXIS, together with Alibozek and others, known and unknown to the Grand Jury, devised and intended to devise, and participated in, a scheme and artifice to defraud the State of Connecticut and its citizens of the intangible right to the honest services of defendant ELLEF and other officials and employees of the State of Connecticut, performed free from deceit, favoritism, bias, conflict of

-21-

interest and self-enrichment by using defendant's ELLEF's position as Co-Chief of Staff in the
Governor's Office to enrich themselves in connection with the award of a no-bid contract to
defendant TUNXIS for renovations of Long Lane School ("LLS") in Middletown, Connecticut,
with the intent to deceive the State of Connecticut and its citizens, accompanied by material
misrepresentations and omissions.

### Manner And Means Of The Scheme

The manner and means by which the scheme was sought to be accomplished included,
among others, the following:

42. LLS was a juvenile detention school operated by DCF. On or about September 26,
1998, a resident of LLS committed suicide, causing public attention to become focused on
existing conditions at LLS.

43. It was part of the scheme and artifice to defraud that on or about October 26, 1998,
defendants ELLEF and TOMASSO, accompanied by Alibozek and other state officials and
employees, went on a "walk through" of LLS to discuss potential renovations to and future use
of LLS. Defendant ELLEF determined that defendant TUNXIS would perform the renovations
and that the renovations should be made on an emergency basis.

44. It was further part of the scheme and artifice to defraud that if the LLS renovations
were deemed an emergency, DPW was authorized, upon written consent of the Governor, to
enter into a contract in excess of $250,000 without competitive bids.

45. It was part of the scheme and artifice to defraud that on or about November 16, 1998,
the Commissioner of DCF, at the direction of Alibozek, and with the knowledge and approval of

-22-

defendant ELLEF, sent a letter to the Commissioner of DPW concerning a request for "emergency services" at LLS, which request was approved by DPW.

46. It was further part of the scheme and artifice to defraud that in about January 1999, the exact date being unknown to the Grand Jury, the Governor of Connecticut gave his consent for DPW to enter, without competitive bidding, into a contract in excess of $250,000 with defendant TUNXIS to renovate LLS.

47. It was further part of the scheme and artifice to defraud that on or about January 27, 1999, defendant TUNXIS and DPW entered into a personal service agreement, and that between February 1999 and November 1999, DPW paid defendant TUNXIS approximately $2,159,892.00 for the renovations performed at LLS.

48. It was further part of the scheme and artifice to defraud that defendant ELLEF influenced the award of a no-bid contract to defendant TUNXIS and intervened in state governmental processes related thereto, and thereby caused payments to be made, to benefit defendant TUNXIS and the financial interests of defendant TOMASSO and his family.

49. It was further part of the scheme and artifice to defraud that defendant ELLEF as well as Alibozek and third parties in whose welfare defendant ELLEF and others had an interest received, and would continue to receive, personal and financial benefits from defendants TOMASSO, TUNXIS and TBI knowing that such benefits were provided with the intent to influence and reward ELLEF in connection with the no-bid contract for LLS renovations.

50. It was further part of the scheme and artifice to defraud that defendant ELLEF performed and authorized official actions to benefit defendants TUNXIS and TOMASSO, without disclosing the personal and financial benefits and other things of value provided to him

-23-

and others in whose welfare defendant ELLEF had an interest by defendants TOMASSO, TBI and TUNXIS.

## Use Of The United States Mails

51.  For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, and TUNXIS, and others did knowingly cause to be placed in an authorized depository for mail matter the following:

| ACT | DATE | USE OF UNITED STATES MAIL |
|-----|------|---------------------------|
| 4A | 1/7/99 | Letter regarding contract from DPW Commissioner to defendant TOMASSO |
| 4B | 3/1/99 | Payment of $667,534.00 from State Comptroller's Office to defendant TUNXIS |
| 4C | 4/7/99 | Payment of $231,245.00 from State Comptroller's Office to defendant TUNXIS |
| 4D | 11/15/99 | Payment of $94,491.00 from State Comptroller's Office to defendant TUNXIS. |

In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

### Racketeering Acts 5A through 5C – Mail Fraud/Theft of Honest Services
(Peter N. Ellef, William A. Tomasso, TBI, Peter N. Ellef II, and LF Design)

52.  Paragraphs 1-18, 22-25 and 30 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

53.  Defendants ELLEF, TOMASSO, TBI, ELLEF II, and LF DESIGN committed the following acts, any one of which alone constitutes Racketeering Act 5.

## The Scheme And Artifice To Defraud

-24-

54. Beginning in approximately November 1998 and continuing to about February 2002, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, TBI, ELLEF II and LF DESIGN, together with Alibozek and others, known and unknown to the Grand Jury, devised and intended to devise, and participated in, a scheme and artifice to defraud the State of Connecticut and its citizens, of the intangible right to the honest services of defendant ELLEF and other officials and employees of the State of Connecticut, performed free from deceit, favoritism, bias, conflict of interest and self-enrichment by using defendant's ELLEF's position as Co-Chief of Staff in the Governor's Office to enrich themselves in connection with the selection of defendant TBI as construction manager of CJTS and the management by defendant TBI of the construction of CJTS, with the intent to deceive the State of Connecticut and its citizens, accompanied by material misrepresentations and omissions.

## Manner And Means Of The Scheme

The manner and means by which the scheme was sought to be accomplished included, among others, the following:

55. It was part of the scheme and artifice to defraud that in or about 1998, defendant ELLEF was involved in plans and discussions regarding the construction of new juvenile corrections facilities in the State of Connecticut.

56. It was further part of the scheme and artifice to defraud that on or about November 22, 1998, defendants ELLEF and TOMASSO, along with Alibozek, the Commissioner of DCF, and other persons affiliated with defendant TBI, traveled to Ohio. The purpose of the trip was to tour juvenile correctional facilities after which the State of Connecticut could model its new juvenile corrections facility.

-25-

57. It was further part of the scheme and artifice to defraud that on or about December 16, 1998, DPW issued a Request for Qualifications ("RFQ") for a new juvenile correction facility.

58. It was further part of the scheme and artifice to defraud that on or about December 29, 1998, defendant TBI responded to the RFQ and described its team as including both the architects of the Marion, Ohio facility and a former youth corrections official who was involved in the development of the Marion, Ohio facility, which defendants ELLEF and TOMASSO had toured during the trip to Ohio.

59. It was further part of the scheme and artifice to defraud that on or about December 31, 1998, a state employee was contacted about both becoming a member of the panel to select which teams would be considered for the CJTS project and TBI being in the final group.

60. It was further part of the scheme and artifice to defraud that on or about January 4, 1999, the panel selected TBI as one of the teams to be considered for the CJTS project.

61. It was further part of the scheme and artifice to defraud that by special legislation, the CJTS project was exempted from competitive bidding, which meant that DPW could select a construction manager based on an interview process.

62. It was further part of the scheme and artifice to defraud that on or about April 23, 1999, a panel, comprised of four DPW officials and the Commissioner of DCF, interviewed five construction firms. TBI was given the top ranking by four of the five voters and was ultimately selected to serve as construction manager on the CJTS project.

-26-

63. It was further part of the scheme and artifice to defraud that defendant ELLEF improperly influenced and attempted to influence the vote for construction manager in favor of defendant TBI.

64. It was further part of the scheme and artifice to defraud that on or about September 24, 1999, defendant TBI signed the construction contract for CJTS, which provided that defendant TBI would receive a $3.3 million management fee.

65. It was further part of the scheme and artifice to defraud that between on or about October 14, 1999 and February 6, 2002, the State of Connecticut issued checks to TBI totaling approximately $49,022,298, which included $3.3 million for defendant TBI's construction management fees.

66. It was further part of the scheme and artifice to defraud that during the course of the construction of CJTS, defendants TOMASSO and TBI attempted to give the landscaping contract for the project to defendants ELLEF II and LF DESIGN.

67. It was further part of the scheme and artifice to defraud that defendant ELLEF influenced the award of the CJTS construction management contract to defendant TBI and the management of the construction by defendant TBI and intervened in the governmental processes related thereto and thereby caused payments to be made to benefit defendant TBI and the financial interests of defendant TOMASSO and his family.

68. It was further part of the scheme and artifice to defraud that defendants ELLEF, ELLEF II and LF DESIGN, as well as Alibozek and others in whose welfare defendant ELLEF and others had an interest, received, and would continue to receive, personal and financial benefits from defendants TOMASSO, TBI and TUNXIS, knowing that such benefits were

-27-

provided with the intent to influence and reward ELLEF in connection with the selection of

defendant TBI as construction manager of CJTS and the management by defendant TBI of the

construction of CJTS.

69. It was further part of the scheme and artifice to defraud that defendant ELLEF

performed and authorized official actions to benefit defendants TOMASSO and TBI without

disclosing the personal and financial benefits and other things of value provided to him and

others in whose welfare defendant ELLEF had an interest by defendants TOMASSO, TBI and

TUNXIS.

## Use Of The United States Mails

70. For the purpose of executing and attempting to execute the aforesaid scheme and

artifice to defraud, on or about the dates listed below, in the District of Connecticut and

elsewhere, defendants ELLEF, TOMASSO, TBI, ELLEF II and LF DESIGN, and others did

knowingly cause to be placed in an authorized depository for mail matter the following:

| ACT | DATE | USE OF UNITED STATES MAIL |
|-----|------|---------------------------|
| 5A | 5/10/98 | Letter from DPW to defendant TOMASSO |
| 5B | 10/14/99 | DPW payment of $2,051,236.00 from State Comptroller's Office to defendant TBI |
| 5C | 11/1/99 | DPW payment of $1,850,164.00 from State Comptroller's Office to defendant TBI |

In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

-28-

## Racketeering Act 6A-6C – Wire Fraud/Theft of Honest Services
(Peter N. Ellef, William A. Tomasso, TBI, and Tunxis)

71. Paragraphs 1-18, 22-25 and 30 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

72. Defendants ELLEF, TOMASSO, TBI, and TUNXIS committed the following acts, any one of which alone constitutes Racketeering Act 6.

### The Scheme And Artifice To Defraud

73. Beginning in approximately February 2002 and continuing to about October 2003, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, TBI, and TUNXIS, together with others known and unknown to the Grand Jury, devised and intended to devise, and participated in, a scheme and artifice to defraud the State of Connecticut and its citizens of the intangible right to the honest services of defendant ELLEF and other officials and employees of the State of Connecticut, performed free from deceit, favoritism, bias, conflict of interest and self-enrichment by using defendant ELLEF's position as Co-Chief of Staff in the Governor's Office to enrich themselves in connection with the investment and loan by quasi-public state agencies to a Massachusetts fuel cell company (Company A), with the intent to deceive the State of Connecticut and its citizens, and accompanied by material misrepresentations and omissions.

### Manner And Means Of The Scheme

The manner and means by which the scheme was sought to be accomplished included, among others, the following:

74. In or about January and February 2002, Company A was seeking capital from the State of Connecticut to fund its ongoing fuel-cell development operations.

-29-

75. It was part of the scheme and artifice to defraud that on or about February 11, 2002, defendants ELLEF and TOMASSO and others traveled to Massachusetts to attend an introductory meeting with the President and Chief Executive Office ("CEO") and others associated with Company A regarding funding from the State of Connecticut.

76. It was further part of the scheme and artifice to defraud that in order for Company A to obtain State of Connecticut funding, it would have to relocate its manufacturing facility to Connecticut.

77. It was further part of the scheme and artifice to defraud that as a result of the February 11, 2002 meeting in Massachusetts, defendant ELLEF arranged for the CEO and others associated with Company A to meet on approximately February 15, 2002 with representatives of two quasi-public agencies called Connecticut Innovations, Inc. ("CII") and the Connecticut Development Authority ("CDA").

78. It was further part of the scheme and artifice to defraud that as a result of defendant TOMASSO's connection to defendant ELLEF and having traveled to Massachusetts with defendant ELLEF to learn about Company A, defendant TOMASSO commenced discussions with the CEO of Company A about locating a site on which to build a manufacturing facility in Connecticut.

79. It was further part of the scheme and artifice to defraud that on or about February 15, 2002, defendant TOMASSO presented Company A's CEO with an offer to lease a manufacturing facility to be built by an affiliate of defendant TBI.

80. It was further part of the scheme and artifice to defraud that as a result of the relationship between defendants ELLEF and TOMASSO, Company A and its CEO feared that if

-30-

Company A did not sign an agreement with defendant TOMASSO, it would not obtain funding from the State of Connecticut.

81. It was further part of the scheme and artifice to defraud that on or about March 1, 2002, Company A's CEO signed an exclusive agreement for the lease of a building at an above-market rate with defendant TOMASSO.

82. It was further part of the scheme and artifice to defraud that after the execution of the March 1, 2002 exclusive agreement, defendant TOMASSO made certain demands on Company A which resulted in a second agreement between Company A and defendant TUNXIS in or about September 2002.

83. It was further part of the scheme and artifice to defraud that the September 2002 agreement required Company A to pay defendant TUNXIS $200,000.

84. It was further part of the scheme and artifice to defraud that on or about October 16, 2003, Company A paid defendant TUNXIS $20,000 under the agreement.

85. It was further part of the scheme and artifice to defraud that defendant ELLEF as well as others in whose welfare defendant ELLEF had an interest, received, and would continue to receive, personal and financial benefits from defendants TOMASSO, TBI and TUNXIS, knowing that such benefits were provided with the intent to influence and reward defendant ELLEF in connection with the participatory and preferential status provided defendants TOMASSO, TBI and TUNXIS in connection with State of Connecticut funding to Company A.

86. It was further part of the scheme and artifice to defraud that defendant ELLEF performed and authorized official actions to benefit and attempt to benefit defendants TOMASSO, TBI and TUNXIS, without disclosing the personal and financial benefits and other

-31-

things of value provided to him and others in whose welfare defendant ELLEF had an interest by defendants TOMASSO, TBI and TUNXIS.

## Use Of Interstate Wires

87. For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, TBI and TUNXIS and others did knowingly cause to be transmitted in interstate commerce by means of wire communication certain signs, signals and sounds the following:

| ACT | DATE | Use of Interstate Wires |
|-----|------|-------------------------|
| 6A | 3/1/02 | Facsimile Letter from defendant TOMASSO in Connecticut to Company A in Massachusetts |
| 6B | 6/10/02 | Facsimile Letter from defendant TOMASSO in Connecticut to Company A in Massachusetts |
| 6C | 6/11/02 | Facsimile from Company A in Massachusetts to CII in Connecticut |

In violation of Title 18, United States Code, Sections 1343, 1346 and 2.

## Racketeering Act 7
(Peter N. Ellef, William A. Tomasso, and TBI)

88. Paragraphs 1-18 and 22-25 and 30 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

89. Defendants ELLEF, TOMASSO, and TBI committed the following acts, any one of which alone constitutes Racketeering Act 7.

90. Beginning in January 2000, a New Jersey Company ("Company C"), which was engaged in the business of operating halfway house facilities for inmate substance abusers, became interested in doing business with the State of Connecticut.

-32-

91. On or about July 10, 2000, the exact date being unknown to the Grand Jury, the CEO and President of Company C was introduced to defendant TOMASSO and others associated with defendant TBI.

92. On or about July 17, 2000, defendant TOMASSO and others associated with defendant TBI traveled to New Jersey to meet with the CEO and President of Company C and tour Company C's facilities.

93. In approximately July 2000, the exact date being unknown to the Grand Jury, defendants ELLEF and TOMASSO met with the CEO and President of Company C at the Governor's Office in the State Capitol in Hartford where defendant ELLEF used his official position to attempt to extort property from the CEO and President of Company C.

**Racketeering Act 7A – Attempted Extortion**
(Peter N. Ellef, William A. Tomasso, and TBI)

94. In or about July 2000, the exact date being unknown to the Grand Jury, in the District of Connecticut, and elsewhere, defendants ELLEF, TOMASSO, and TBI attempted to commit extortion, which attempted extortion would have obstructed, delayed and affected commerce, by knowingly attempting to obtain property, that is, participation in contractual relationships involving the State of Connecticut, from Company C, with Company C's consent under the color of official right and induced by the wrongful use of actual and threatened fear of economic harm.

In violation of Title 18, United States Code, Sections 1951 and 2.

**Racketeering Act 7B – Conspiracy to Commit Extortion**
(Peter N. Ellef, William A. Tomasso, and TBI)

-33-

95. In or about July 2000, in the District of Connecticut and elsewhere, defendants
ELLEF, TOMASSO, and TBI, knowingly and willfully conspired and agreed to unlawfully
obstruct, delay and affect commerce by extortion, in that defendants ELLEF, TOMASSO and
TBI did unlawfully conspire to obtain property, that is, participation in contractual relationships
involving the State of Connecticut, from Company C, with Company C's consent under the color
of official right and induced by the wrongful use of actual and threatened fear of economic harm.

In violation of Title 18, United States Code, Section 1951.

### Racketeering Act 8- Conspiracy To Commit Money Laundering
(Peter N. Ellef, William A. Tomasso, Peter N. Ellef II, and LF Design)

96. Paragraphs 1-18, 22-25 and 30 of Count One of this Indictment are realleged and
incorporated by reference as though fully set forth herein.

97. At all times relevant to this Indictment, the activities of Fleet Bank affected
interstate commerce.

98. From in our about March 1999 through in or about April 2002, the exact dates being
unknown to the Grand Jury, in the District of Connecticut and elsewhere, defendants ELLEF,
TOMASSO, ELLEF II, and LF DESIGN did unlawfully and knowingly combine, conspire,
confederate, agree and reach a tacit understanding with each other and with persons known and
unknown to the Grand Jury, to commit certain offenses under Title 18, United States Code,
Section 1956, affecting interstate commerce, as follows:

> Knowing that the property involved in financial transactions represented the
> proceeds of some form of unlawful activity, to conduct and attempt to conduct
> financial transactions that involved the proceeds of specified unlawful activity,
> that is, mail fraud/theft of honest services, in violation of Title 18, United States
> Code, Sections 1341/1346, and bribery, in violation of Title 18, United States
> Code, Section 666 and Conn. Gen. Stat. Sections 53a-147 and 53a-148, knowing
> that the transactions were designed in whole and in part to conceal and disguise

-34-

the nature, location, source, ownership and control of the proceeds of specified
unlawful activity, in violation of Title 18, United States Code, Section
1956(a)(1)(B)(i).

## Manner And Means

The manner and means by which the defendants sought to accomplish the conspiracy
included, among others, the following:

99. It was part of the conspiracy that defendants ELLEF, ELLEF II, and LF DESIGN as
well as other co-conspirators and persons in whose welfare defendant ELLEF had an interest,
received personal and financial benefits from defendants TOMASSO, TBI and TUNXIS, while
defendants ELLEF, ELLEF II and LF DESIGN knew that such benefits were provided with the
intent to influence and reward defendant ELLEF and other co-conspirators in the performance of
official acts.

100. It was part of the conspiracy that these benefits included, but were not limited to,
substantial business and contracts, including cash advances to defendants ELLEF II and LF
DESIGN; consulting payments to defendant LF DESIGN to cover the costs associated with the
development of a business to benefit defendants ELLEF, ELLEF II and LF DESIGN; and free
rent to defendants ELLEF II and LF DESIGN.

101. It was part of the conspiracy that in about March 1999, defendant ELLEF obtained
a corporate American Express card issued on the account of defendant LF DESIGN.

102. It was part of the conspiracy that between about March 1999 and about April 2002,
while he was Co-Chief of Staff to the Governor of Connecticut, defendant ELLEF used his LF
DESIGN corporate American Express card for personal expenses.

-35-

103. It was part of the conspiracy that defendants ELLEF and ELLEF II caused personal expenses made on defendant ELLEF's corporate American Express card to be falsely characterized on defendant LF DESIGN's books and records as legitimate business expenses.

104. It was part of the conspiracy that defendants ELLEF and ELLEF II caused defendant ELLEF's personal expenses to be paid by defendant LF DESIGN with proceeds of specified unlawful activity by mailing checks to American Express drawn on defendant LF DESIGN's account at Fleet Bank.

105. It was part of the conspiracy that defendant ELLEF failed to disclose on his annual Statements of Financial Interest with the State of Connecticut Ethics Commission his own personal association with defendant LF DESIGN and his use of the LF DESIGN corporate American Express card for personal expenses as a source of income exceeding $1,000 annually.

106. It was part of the conspiracy that defendant TOMASSO maintained a copy of defendant ELLEF's LF DESIGN corporate American Express card, and that defendant TOMASSO directed his executive assistant to use it to make travel arrangements for defendant ELLEF

### Overt Acts

107. In furtherance of the conspiracy and to achieve the objects thereof, defendants ELLEF, TOMASSO, ELLEF II and LF DESIGN, and others known and unknown to the Grand Jury, committed and caused to be committed at least one of the following overt acts, among others, in the District of Connecticut and elsewhere:

a. On or about November 24 and 26, 1999, two round-trip tickets (one for $219.50 and one for $182.50) from Hartford, CT to Ft. Lauderdale, FL on Delta Airlines were charged to

-36-

defendant ELLEF's LF DESIGN corporate American Express card. On or about December 6, 1999, a charge of $316.41 at Nordstrom's was made to defendant ELLEF's corporate American Express card. These charges, among others for defendant ELLEF, are reflected on an American Express account statement dated December 19, 1999, which listed a balance due of $9,624.17.

b. On or about January 3, 2000, defendant ELLEF II caused check number 1509 to be drawn on defendant LF DESIGN's account at Fleet Bank payable to American Express in the amount of $9,624.17, and to be mailed to American Express, which credited defendant LF DESIGN's account for that amount.

c. On or about March 22, 2000, a charge of $148.95 at Travelsmith was made on defendant ELLEF's LF DESIGN corporate American Express card. On or about April 15, 2000, a charge of $152.06 at the Fog Catcher Inn in California was made on defendant ELLEF's corporate American Express card. These charges, among others for defendant ELLEF, are reflected on an American Express account statement dated April 19, 2000, which listed a balance due of $5,954.46.

d. On or about May 4, 2000, defendant ELLEF II caused check number 1882 to be drawn on defendant LF DESIGN's account at Fleet Bank payable to American Express in the amount of $5,954.46, and to be mailed to American Express, which credited defendant LF DESIGN's account for that amount.

e. On or about April 18, 2000, a charge of $593.42 at the Inn at Morro Bay in California was made on defendant ELLEF's LF DESIGN corporate American Express card. On or about April 21, 2000, a charge of $859.72 at the Ahwahnee Hotel at Yosemite National Park in California, and a charge of $349.28 at National Car Rental, were made on defendant ELLEF's

-37-

corporate American Express card. These charges, among others for defendant ELLEF, are reflected on an American Express account statement dated May 19, 2000, which listed a balance due of $11,857.79.

f. On or about June 6, 2000, defendant ELLEF II caused check number 1999 to be drawn on defendant LF DESIGN's account at Fleet Bank payable to American Express in the amount of $11,857.79, and to be mailed to American Express, which credited defendant LF DESIGN's account for that amount.

g. On or about January 25 and 28, 2001, charges of $987.90 and $369.04, respectively, were made at Walt Disney World in Florida on defendant ELLEF's LF DESIGN corporate American Express card. These charges, among others for defendant ELLEF, are reflected on an American Express account statement dated February 19, 2001, which listed a balance due of $7,651.06.

h. On or about March 7, 2001, defendant ELLEF II caused check number 2699 to be drawn on defendant LF DESIGN's account at Fleet Bank payable to American Express in the amount of $7,651.06, and to be mailed to American Express, which credited defendant LF DESIGN's account for that amount.

i. On or about July 18, 2001, a round-trip ticket from Hartford, CT to Phoenix, AZ for $1,324.00 on America West Airlines was charged to defendant ELLEF's LF DESIGN corporate American Express card. This charge, among others for defendant ELLEF, is reflected on an American Express account statement dated July 20, 2001, which listed a balance due of $25,083.78.

-38-

j. On or about August 4, 2001, defendant ELLEF II caused check number 3085 to be drawn on defendant LF DESIGN's account at Fleet Bank payable to American Express in the amount of $25,083.78, and to be mailed to American Express, which credited defendant LF DESIGN's account for that amount.

In violation of Title 18, United States Code, Section 1956(h).

All in violation of Title 18, United States Code, Section 1962(c).

## COUNT THREE – Conspiracy To Commit Theft/Bribery
## Concerning Programs Receiving Federal Funds
(18 U.S.C. §§ 371, 2)

(Peter N. Ellef, William A. Tomasso, TBI, Tunxis, Peter N. Ellef, II and LF Design)

1. Paragraphs 1-18, 23-25 and 30 of Count One and paragraph 10 of Count Two of this

Indictment are realleged and incorporated by reference as though fully set forth herein.

2. Between October 1997 and April 2002, approximately, in the District of Connecticut

and elsewhere, defendants, ELLEF, TOMASSO, TBI, and TUNXIS, aided and abetted by

defendants ELLEF II and LF DESIGN, together with Alibozek and other individuals, known and

unknown to the Grand Jury, did unlawfully, willfully and knowingly conspire, combine,

confederate and agree together and with each other to commit certain offenses against the United

States of America as follows:

(a) For defendant ELLEF, aided and abetted by defendants ELLEF II and LF DESIGN, together with Alibozek and others known and unknown to the Grand Jury, to knowingly, willfully and corruptly solicit and agree to accept things of value from the defendants TOMASSO, TBI, and TUNXIS, intending to be influenced and rewarded in connection with the business, transactions and series of transactions of the State of Connecticut involving a thing of value of $5,000 or more, in violation of Title 18, United States Code, §§ 666(a)(1)(B) and 2.

(b) For defendants TOMASSO, TBI and TUNXIS to knowingly, willfully and corruptly give, offer, and agree to give things of value to defendants ELLEF, ELLEF II, LF DESIGN as well as Alibozek and others with the intent to influence and reward agents of State government, defendant ELLEF and Alibozek, in connection with the business, transactions and series of transactions of the State of Connecticut involving a thing of value of $5,000 or more, in violation of Title 18, United States Code, §§ 666(a)(2) and 2.

All in violation of Title 18, United States Code Sections 371 and 2.

**COUNTS FOUR & FIVE – Mail Fraud/Theft of Honest Services**
**18 U.S.C. §§ 1341, 1346 and 2**
(Peter N. Ellef, William A. Tomasso, Peter N. Ellef II and LF Design)

1.  Paragraphs 1-18, 23-25, and 30 of Count One and paragraphs 14-24 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

**The Scheme And Artifice To Defraud**

2.  Beginning in approximately October 1997 and continuing to about August 2000, in the District of Connecticut and elsewhere, defendants ELLEF and TOMASSO, ELLEF II and LF DESIGN, and others known and unknown to the Grand Jury, in the District of Connecticut and elsewhere, devised and intended to devise, and participated in, a scheme and artifice to defraud the State of Connecticut and its citizens of the intangible right to the honest services of defendant ELLEF and other officials and employees of the State of Connecticut, performed free from deceit, favoritism, bias, conflict of interest and self-enrichment in that the defendants used defendant ELLEF's position as Co-Chief of Staff in the Governor's Office to enrich themselves in connection with the award and attempted award of a grants and low-interest loans to Company T, with the intent to deceive the State of Connecticut and its citizens, accompanied by material misrepresentations and omissions.

**The Use Of The United States Mails**

3.  For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO,  ELLEF II and LF DESIGN and others did knowingly cause to be placed in an authorized depository for mail matter the following:

-41-

| COUNTS | DATE | USE OF UNITED STATES MAIL |
|--------|------|---------------------------|
| 4 | 6/5/00 | Invoice #1814 from defendant LF DESIGN |
| 5 | 7/5/00 | Invoice #1857 from defendant LF DESIGN |

In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

### COUNT SIX - Mail Fraud/Theft of Honest Services
### 18 U.S.C. §§ 1341, 1346 and 2
(Peter N. Ellef, William A. Tomasso, and Tunxis)

1. Paragraphs 1-18, 23-25 and 30 of Count One and paragraphs 42-50 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

### The Scheme And Artifice To Defraud

2. Beginning in approximately October 1998 and continuing to about November 1999, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, and TUNXIS, together with Alibozek and others, known and unknown to the Grand Jury, devised and intended to devise, and participated in, a scheme and artifice to defraud the State of Connecticut and its citizens of the intangible right to the honest services of defendant ELLEF and other officials and employees of the State of Connecticut, performed free from deceit, favoritism, bias, conflict of interest and self-enrichment by using defendant ELLEF's position as Co-Chief of Staff in the Governor's Office to enrich themselves in connection with the award of a no-bid contract to defendant TUNXIS for renovations of Long Lane School ("LLS") in Middletown, Connecticut, with the intent to deceive the State of Connecticut and its citizens, accompanied by material misrepresentations and omissions.

-42-

## Use Of The United States Mails

3. For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, and TUNXIS, and others did knowingly cause to be placed in an authorized depository for mail matter the following:

| COUNT | DATE | USE OF UNITED STATES MAIL |
|---|---|---|
| 6 | 11/15/99 | Payment of $94,491.00 from State Comptroller's Office to defendant TUNXIS |

In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

### COUNTS SEVEN and EIGHT– Mail Fraud/Theft of Honest Services
### 18 U.S.C. §§ 1341, 1346 and 2
(Peter N. Ellef, William A. Tomasso, TBI, Peter N. Ellef II, and LF Design)

1. Paragraphs 1-18, 23-25 and 30 of Count One and paragraphs 55-69 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

### The Scheme And Artifice To Defraud

2. Beginning in approximately November 1998 and continuing to about February 2002, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, TBI, ELLEF II and LF DESIGN, together with Alibozek and others, known and unknown to the Grand Jury, devised and intended to devise, and participated in, a scheme and artifice to defraud the State of Connecticut and its citizens, of the intangible right to the honest services of defendant ELLEF and other officials and employees of the State of Connecticut, performed free from deceit, favoritism, bias, conflict of interest and self-enrichment by using defendant ELLEF's position as Co-Chief of Staff in the Governor's Office to enrich themselves in connection with both the selection of defendant TBI as construction manager of CJTS and the management by defendant

-43-

TBI of the construction of CJTS, with the intent to deceive the State of Connecticut and its

citizens and accompanied by material misrepresentations and omissions.

## Use Of The United States Mails

3. For the purpose of executing and attempting to execute the aforesaid scheme and

artifice to defraud, on or about the dates listed below, in the District of Connecticut and

elsewhere, defendants ELLEF, TOMASSO, TBI, ELLEF II and LF DESIGN and others did

knowingly cause to be placed in an authorized depository for mail matter the following:

| COUNTS | DATE | USE OF UNITED STATES MAIL |
|--------|------|---------------------------|
| 7 | 10/14/99 | DPW payment of $2,051,236.00 from State Comptroller's Office to defendant TBI |
| 8 | 11/1/99 | DPW payment of $1,850,164.00 from State Comptroller's Office to defendant TBI |

In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

## COUNTS NINE-ELEVEN - Wire Fraud/Theft of Honest Services
## 18 U.S.C. §§ 1343, 1346 and 2
(Peter N. Ellef, William A. Tomasso, TBI, and Tunxis)

1. Paragraphs 1-18, 23-25 and 30 of Count One and paragraphs 74-86 of Count Two of

this Indictment are realleged and incorporated by reference as though fully set forth herein.

## The Scheme And Artifice To Defraud

2. Beginning in approximately February 2002 and continuing to about October 2003, in

the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, TBI, and TUNXIS,

together with others known and unknown to the Grand Jury, devised and intended to devise, and

participated in, a scheme and artifice to defraud the State of Connecticut and its citizens of the

-44-

intangible right to the honest services of defendant ELLEF and other officials and employees of the State of Connecticut, performed free from deceit, favoritism, bias, conflict of interest and self-enrichment by using defendant ELLEF's position as Co-Chief of Staff in the Governor's Office to enrich themselves in connection with the investment and loan by quasi-public state agencies to a Massachusetts fuel cell company (Company A), with the intent to deceive the State of Connecticut and its citizens, accompanied by material misrepresentations and omissions.

### Use Of Interstate Wires

3. For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, TBI and TUNXIS did knowingly cause to be transmitted in interstate commerce by means of wire communication certain signs, signals and sounds the following:

| COUNTS | DATE | USE OF INTERSTATE WIRES |
|--------|------|-------------------------|
| 9 | 3/1/02 | Facsimile of Letter from defendant TOMASSO in Connecticut to Company A in Massachusetts |
| 10 | 6/10/02 | Facsimile Letter from defendant TOMASSO in Connecticut to Company A in Massachusetts |
| 11 | 6/11/02 | Facsimile from Company A in Massachusetts to CII in Connecticut |

In violation of Title 18, United States Code, Sections 1343, 1346 and 2.

-45-

## COUNT TWELVE – Attempted Extortion
## 18 U.S.C. §§ 1951and 2
(Peter N. Ellef, William A. Tomasso, TBI)

1. Paragraphs 1-18 and 23-25 and 30 of Count One and paragraphs 90-93 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. In or about July 2000, the exact date being unknown to the Grand Jury, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, and TBI, attempted to commit extortion, which attempted extortion would have obstructed, delayed and affected commerce, by knowingly attempting to obtain property, that is, participation in contractual relationships involving the State of Connecticut, from Company C, with Company C's consent under the color of official right and induced by the wrongful use of actual and threatened fear of economic harm.

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT THIRTEEN – Conspiracy to Commit Extortion
## 18 U.S.C. §§ 1951 and 2
(Peter N. Ellef, William A. Tomasso, and TBI)

1. Paragraphs 1-18 and 23-25 and 30 of Count One and paragraphs 90-93 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. In or about July 2000, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, and TBI, knowingly and willfully conspired and agreed to unlawfully obstruct, delay and affect commerce by extortion, in that defendants ELLEF, TOMASSO and TBI did unlawfully conspire to obtain property, that is, participation in contractual relationships involving the State of Connecticut, from Company C, with Company C's consent under the color of official right induced by the wrongful use of actual and threatened fear of economic harm.

In violation of Title 18, United States Code, Sections 1951 and 2.

-46-

15

**COUNT FOURTEEN- Conspiracy To Money Launder**
**(18 U.S.C. § 1956(h))**
(Peter N. Ellef, William A. Tomasso, Peter N. Ellef II and LF Design)

1. Paragraphs 1-18, 22-25 and 30 of Count One and paragraphs 97 and 99-107 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. From in or about March 1999 through in or about April 2002, the exact dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, defendants ELLEF, TOMASSO, ELLEF II and LF DESIGN did unlawfully and knowingly combine, conspire, confederate, agree and reach a tacit understanding with each other and with persons known and unknown to the Grand Jury, to commit certain offenses under Title 18, United States Code, Section 1956, affecting interstate commerce, as follows:

> Knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, to conduct and attempt to conduct financial transactions that involved the proceeds of specified unlawful activity, that is, mail fraud/theft of honest services, in violation of Title 18, United States Code, Sections 1341/1346, and bribery, in violation of Title 18, United States Code, Section 666 and Conn Gen. Stat. Sections 53a-147 and 53a-148, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT FIFTEEN – Conspiracy to Defraud the IRS
### (18 U.S.C. § § 371 and 2)
(Peter N. Ellef, Peter N. Ellef II, LF Design)

1. Paragraphs 1-18, 22-25 and 30 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. From about January 1, 1999 until at least April, 2002, approximately, in the District of Connecticut and elsewhere, defendants ELLEF, ELLEF II and LF DESIGN, together with others known and unknown to the Grand Jury, did unlawfully, willfully, and knowingly conspire, combine, confederate, agree to devise a scheme and artifice to defraud the United States for the purpose of impairing, impeding, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department (hereinafter, the "IRS") in the ascertainment, computation, assessment and collection of the revenue: specifically, income taxes.

## Manner And Means Of The Conspiracy

The manner and means by which the defendants sought to accomplish the conspiracy included, among others, the following:

3. It was part of the conspiracy that defendants ELLEF II and LF DESIGN received substantial financial benefits from defendants TOMASSO, TBI and TUNXIS. The financial benefits included free rent, consulting payments and payments for landscaping and snow removal.

4. It was further part of the conspiracy that these benefits were given to defendants ELLEF II and LF DESIGN by defendants TOMASSO, TBI, and TUNXIS for, because of and in

-48-

consideration for favorable and preferential treatment from defendant ELLEF in connection with official State of Connecticut business.

5. It was further part of the conspiracy that from approximately January 2000 to April 2002, defendant TBI paid rent, totaling approximately $18,760.16, for the office of defendant LF DESIGN.

6. It was further part of the conspiracy that defendant LF DESIGN did not report as income on its tax returns, Forms 1065, the payment of rent by defendant TBI

7. It was further part of the conspiracy that between January 1999 and April 2002, the payments for landscaping and snow removal represented, at times, approximately as much as 50 % of defendant LF DESIGN's sales.

8. It was further part of the conspiracy that from approximately March 1999, defendant ELLEF had a corporate American Express card issued in his name on the defendant LF DESIGN's corporate account, notwithstanding the fact that defendant ELLEF was not an employee of LF DESIGN.

9. It was further part of the conspiracy that defendant ELLEF used the LF DESIGN corporate American Express card for personal expenses.

10. It was further part of the conspiracy that defendants ELLEF II and LF DESIGN knowingly and willfully created and caused to be created false, fictitious and fraudulent entries on LF DESIGN's American Express card statements, and on LF DESIGN's books and records in order to disguise defendant ELLEF's personal expenses as business expenses.

-49-

11. It was further part of the conspiracy that between approximately 1999 and 2001, defendant LF DESIGN paid expenses related to the construction of a home for defendant ELLEF II.

12. It was further part of the conspiracy that defendants ELLEF II and LF DESIGN knowingly and willfully created and caused to be created false, fictitious and fraudulent entries on LF DESIGN's books and records in order to disguise the expenses related to the home construction as business expenses.

13. It was further part of the conspiracy that defendant LF DESIGN's books and records, including the false entries related to personal expenses for defendants ELLEF and ELLEF II, were provided to the accountant who prepared LF DESIGN's tax returns for, among other tax years, the tax years 1999, 2000 and 2001.

14. It was further part of the conspiracy that defendants LF DESIGN and ELLEF II, aided and abetted by defendant ELLEF, knowingly and willfully filed and caused the filing of false partnership income tax returns for defendant LF DESIGN and defendants ELLEF and ELLEF II knowingly and willfully filed false personal income tax returns .

### Overt Acts

15. In furtherance of the conspiracy and to effect its objects, at least one of the conspirators committed or caused to be committed one or more of the following overt acts in the District of Connecticut and elsewhere:

a. On or about July 6, 1999, defendants LF DESIGN and ELLEF II issued and caused to be issued a check for $2,370.00 to an engineering company which performed work on the site of

defendant ELLEF II's new home, which expenditure was classified as a business expense, consulting services, on defendant LF DESIGN's books and records.

b. On or about November 1, 2000, defendants LF DESIGN and ELLEF II issued and caused to be issued a check for $5,000 to a construction company which performed work on the driveway for defendant ELLEF II's new home, which expenditure was capitalized as land improvement on defendant LF DESIGN's books and records.

c. On or about November 20, 1999, a charge in the amount of $292.43 for a bottle of champagne for a former high-level state official was made on defendant ELLEF's LF DESIGN corporate American Express card, which charge was falsely characterized on defendant LF DESIGN's books and records as a business expense.

d. On or about March 15-16, 2001, a charge in the amount of $1,147.00 at Ten's Restaurant in New York City was made on defendant ELLEF's LF DESIGN corporate American Express card, which charge was falsely characterized on defendant LF DESIGN's books and records as a business expense.

e. That for the calendar tax years 1999, 2000 and 2001, defendant LF DESIGN aided and abetted by defendants ELLEF and ELLEF II, did wilfully make and subscribe false and fraudulent U.S. Partnership Income Tax Returns, Forms 1065, which were false and fraudulent in that defendant LF DESIGN took deductions to which it knew it was not entitled and failed to report as income the rent payments made on its behalf by defendant TBI.

All in violation of Title 18, United States Code, Sections 371 and 2.

-51-

## FORFEITURE

1. The allegations contained in Counts One and Two of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 in the event of any defendant's conviction under Count One and Two of this Indictment.

2. The defendants ELLEF, TOMASSO, TBI, TUNXIS, ELLEF II, and LF DESIGN:

i. have acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

ii. have property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

3. The interests of the defendants subject to forfeiture to the United States of America pursuant to Title 18, United States Codes, Sections 1963(a)(1) and (a)(3) include but are not limited to a money judgment in the amount of $11 million, consisting of the following amounts:

(a) monies received and paid as bribes as alleged in Racketeering Acts 1 through 8 of Count Two of this Indictment; and

-52-

(b) monies paid by the State of Connecticut and by Company A to Company T and to defendants TOMASSO, TBI, and TUNXIS, as described in Racketeering Acts 1 through 8 of Count Two of this Indictment.

4. If any of the forfeitable property described in paragraphs 2 and 3, above, as a result of any act or omission of any defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the court, (d) has been substantially diminished in value, or (e) has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of said defendants up to the value of all of the above-described forfeitable property.

5. The above-named defendants, and each of them, are jointly and severally liable for the forfeiture obligations as alleged above.

All pursuant to Title 18, United States Code, Section 1963.

-53-

SENTENCING ALLEGATIONS

1. With respect to each count of the Indictment, except Counts 12-15, with which they are charged:

a. Defendants ELLEF and TOMASSO were each leaders and organizers of a criminal activity that involved five or more participants and was otherwise extensive.

b. Defendant ELLEF abused his position of public trust.

c. The offense involved more than one bribe.

d. The value of the payments exceeded $1,000,000.

e. The offense involved a payment for the purpose of influencing an official holding a high-level decision-making or sensitive position.

2. With respect to each of Counts One, Two and Three of the Indictment with which each of the defendants is charged, the value of the benefit received in return for the payments exceeded $7,000,000.

A TRUE BILL

_____
FOREPERSON

UNITED STATES OF AMERICA

_____
JOHN H. DURHAM
ACTING  UNITED STATES ATTORNEY

_____
NORA R. DANNEHY
ASSISTANT UNITED STATES ATTORNEY

_____
ERIC J. GLOVER
ASSISTANT UNITED STATES ATTORNEY

-54-

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only) __Acumentrics Corporation v. Connecticut Innovations,__
    __Inc., et al.__

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

    [X]  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    [ ]  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,        *Also complete AO 120 or AO 121
               740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

    [ ]  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
               315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
               380, 385, 450, 891.

    [ ]  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
               690, 810, 861-865, 870, 871, 875, 900.

    [ ]  V.    150, 152, 153.

    04  12432 WGY

3.  Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?
    YES [ ]    NO [XX]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
    YES [ ]    NO [xx]
    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
    YES [ ]    NO [ ]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
    YES [ ]    NO [X]

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
    YES [X]    NO [ ]

    A.  If yes, in which division do all of the non-governmental parties reside?
        Eastern Division [XX]    Central Division [ ]    Western Division [ ]

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
        Eastern Division [ ]    Central Division [ ]    Western Division [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
    YES [ ]    NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _Christopher D. Engebretson, Esq., Robert R. Pierce, Esq._
ADDRESS _Pierce & Mandell, P.C., 11 Beacon Street, Suite 800, Boston, MA 02108_
TELEPHONE NO. _(617) 720-2444_

(Coversheetlocal.wpd - 10/17/02)

*&JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Acumentrics Corporation

**DEFENDANTS** Connecticut Innovations, Inc., Connecticut Development Authority, Tomasso Brothers, Inc., Tunxis Management Co., Arthur Dietrick, Peter Ellef, and William Tomasso

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Christopher D. Engebretson, Robert R. Pierce
Pierce & Mandell, P.C., 11 Beacon St., Suite 800
Boston, MA 02108    (617) 720-2444

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgement | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☒ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Determination Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

---

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

18 USC sec 1964. Plaintiff was fraudulently induced to enter into agreements with defendants engaged in a racketeering conspiracy.

**VII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ 20,000,000.00   CHECK YES only if demanded in complaint:   JURY DEMAND: ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**  (See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE  November 17, 2004

SIGNATURE OF ATTORNEY OF RECORD  _[signature]_

---

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____