UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ACUMENTRICS CORPORATION,<br><br>    Plaintiff,<br><br>  *vs.*<br><br>CONNECTICUT INNOVATIONS, INCORPORATED, CONNECTICUT DEVELOPMENT AUTHORITY, TOMASSO BROTHERS, INC., TUNXIS MANAGEMENT CO., ARTHUR DIETRICK, PETER ELLEF, and WILLIAM TOMASSO,<br><br>    Defendants. | CIVIL ACTION NO. 04-12432 WGY |

**DEFENDANT CONNECTICUT INNOVATIONS, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF COMBINED
MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

   The plaintiff, Acumentrics Corporation ("Acumentrics"), expressly agreed to submit to arbitration any and all claims arising under, in connection with, or relating to its March 25, 2002 Stock Purchase Agreement ("Stock Purchase Agreement") with the defendant Connecticut Innovations, Inc. ("CII"). All of Acumentrics' claims against CII in this action are subject to this arbitration provision. CII therefore moves to compel arbitration and to stay the claims against CII until the conclusion of such arbitration.

   In support of its accompanying motion, CII respectfully submits this Memorandum of Law.

## I.    FACTUAL BACKGROUND

### A.    The Parties

CII is a legislatively created public instrumentality and political subdivision of the State of Connecticut, created for the performance of an essential public and governmental function. Conn. Gen. Stat. § 32-35(a).  Its mission is to stimulate Connecticut's technology economy, in part through venture investments and other funding initiatives.  Conn. Gen. Stat. §§ 32-35, 32-39; Complaint ¶¶ 2, 12.  Similarly, the defendant Connecticut Development Authority ("CDA"), is a legislatively created public instrumentality and political subdivision of the State of Connecticut, created for the performance of an essential public and governmental function. Conn. Gen. Stat. §§ 32-11a(a).  Both CII and CDA are quasi-public agencies of the State of Connecticut.  Conn. Gen. Stat. § 1-120.

Acumentrics is assertedly a "high-technology company that designs and manufactures power supply equipment, including durable fuel cells and uninterruptible power supply packs." Complaint, ¶ 11.  According to allegations in the Complaint and an Indictment attached thereto, early in 2002, Acumentrics was seeking capital from the State of Connecticut to fund its ongoing fuel cell development operations.  See Indictment in United States v. Ellef, et al., 3:04-cr-284 (PCD) ("Indictment"), ¶ 74, attached to the Complaint.[1]

Defendant Peter Ellef was co-chief of staff to the Governor of the State of Connecticut from October 1997 to March 2002.[2]  Indictment, ¶ 3.  Defendant William Tomasso ("Tomasso")

---

[1]  The Complaint cryptically refers to but does not formally incorporate the allegations made by the United States against defendants Peter Ellef, William Tomasso, Tomasso Brothers, Inc. ("TBI"), and Tunxis Management, Inc. ("Tunxis").  On information and belief, the "Company A" identified in the Indictment is Acumentrics.  See Complaint, ¶ 31. Ellef, Tomasso, TBI, and Tunxis (as well as others not mentioned in Acumentrics' Complaint) are named defendants in the Indictment.  See Indictment, ¶¶ 3,7, 8, and 9.  The Indictment contains *no* allegations of criminal conduct against CII, CDA, or Arthur Diedrick.

[2]  Paragraph 5 of the Complaint alleges that Peter Ellef "was at all relevant times an officer, director and/or agent of CII."  CII notes that Ellef served in none of these capacities during the times and with respect to the transactions described in the Complaint.

was an officer of defendant Tomasso Brothers, Inc. ("TBI") and president of defendant Tunxis Management Co. ("Tunxis"). Indictment, ¶ 7.

**B.    The Allegations in the Indictment and Complaint**

The Indictment asserts that Ellef, Tomasso, TBI, and Tunxis used Ellef's position as co-chief of staff to enrich themselves in connection with the investment by the defendant quasi-public state agencies in Acumentrics. Indictment, ¶ 73. It alleges that as a result of Tomasso's connection to Ellef, Tomasso commenced discussions with Acumentrics about locating a site on which to build a manufacturing facility in Connecticut. Indictment, ¶ 78. It further alleges that because of the relationship between Ellef and Tomasso, Acumentrics feared that it would not receive funding from the state of Connecticut if it did not sign an agreement with Tomasso. Indictment, ¶ 80. Consequently, Acumentrics asserts that on March 1, 2002, it entered into a letter of intent with TBI to negotiate a lease of a building owned by Tomasso at an above-market rate. Complaint, ¶ 20.

On March 25, 2002, CII and Acumentrics entered into a "series of interrelated agreements," including a Stock Purchase Agreement (copy attached hereto as Exhibit A) and a Supplier Agreement (copy attached hereto as Exhibit B). Complaint, ¶ 17. Pursuant to the Stock Purchase Agreement, CII purchased 444,444 shares of Acumentrics' Class B Common Stock for about $4 million. Complaint, ¶ 19. Under the Supplier Agreement, CII agreed to purchase fuel cells from Acumentrics for $3 million. Complaint, ¶ 17. The Stock Purchase Agreement required Acumentrics to move its manufacturing operations to Connecticut (Exhibit A, ¶ 10.1), and the Supplier Agreement conditioned advance payment on the execution of a lease for a facility to engage in full-scale manufacturing in Connecticut. Exhibit B, ¶ 2.2.

Acumentrics alleges that, because it was apparent that it could not come to agreement with Tomasso concerning a lease, it entered into a further agreement with Tomasso in September 2002 to appease Tomasso and clear the way for negotiations with third parties. The new agreement allegedly required Acumentrics to pay Tunxis $200,000. Acumentrics allegedly paid Tunxis $20,000 on October 16, 2002, to extend the payment terms of that agreement. Complaint, ¶ 22.

Acumentrics eventually entered into a lease for a manufacturing facility in Connecticut not owned by Tomasso. Complaint, ¶ 24. Upon execution of that lease and the subsequent issuance of a certificate of occupancy, CII prepaid $1.5 million to Acumentrics on the fuel cell orders as required under the Supplier Agreement. Complaint, ¶ 23.

By October 2004, despite receiving $5.5 million in funds from CII, Acumentrics had not relocated to Connecticut and had not provided any fuel cells. Complaint, ¶¶ 26, 29. On October 22, 2004, by written notice, CII sought to exercise its right to resell its stock to Acumentrics as permitted under the Stock Purchase Agreement. Complaint, ¶¶ 28, 29.

### C. The Arbitration Agreement and Its Breach by the Present Action

In § 11.12 of the Stock Purchase Agreement, CII and Acumentrics expressly and unequivocally chose arbitration as the method for resolving any and all potential disputes between them that were in any way related to or connected with that Agreement. See Stock Purchase Agreement § 11.12 ("Arbitration Clause"). The Arbitration Clause states in relevant part that

> Any dispute, controversy or disputed claim arising under, in connection with or relating to, this Agreement, as well as any amendment, purported amendment or termination, or any breach or violation thereof, shall be finally settled and determined under and pursuant to the applicable commercial arbitration rules and procedures of the American Arbitration Association.

4

Stock Purchase Agreement § 11.12.

On November 17, 2004, in breach of its agreement to arbitrate all disputes arising under, in connection with, or related to the Stock Purchase Agreement, Acumentrics filed the six-count Complaint (the "Complaint") in this action. The Complaint purports to assert various claims against CII and the other defendants under the federal Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1962(b) and (c), (Counts I and II), a common law breach of contract claim (Count III), a statutory usury claim under M.G.L. c. 271 § 49 (Count IV), a combined common law fraud and misrepresentation claim (Count V), and a claim under Massachusetts' Consumer and Business Protection Act, M.G.L. c. 93A §§ 2 and 11 (Count VI). Each of these counts arises under, is in connection with, or relates to the Stock Purchase Agreement.

Without much effort at particularity, Acumentrics endeavors to assert each claim against each and every defendant. CII now moves the Court to compel Acumentrics to arbitrate its claims against CII. CII further moves for an order staying Acumentrics' claims against CII in the present action until such arbitration is concluded.

## II.    LAW AND ARGUMENT

### A.    Federal Law Strongly Favors Arbitration.

Federal law reflects a "liberal policy favoring arbitration agreements." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983); see also Bercovitch v. Baldwin Sch., 133 F.3d 141, 147 (1st Cir. 1998). The Federal Arbitration Act ("FAA" or the "Act"), 9 U.S.C. §§ 1-16, authorizes judicial enforcement of arbitration agreements between private parties regarding disputes that affect interstate commerce. Section 2 of the Act provides in relevant part that a "written provision in . . . a contract evidencing a transaction involving

commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  When the claims asserted in a federal action are subject to an arbitration agreement, Section 3 of the Act directs courts, upon motion by a party, to stay the pending litigation, and Section 4 directs courts to compel arbitration.  9 U.S.C. §§ 3, 4.  "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (emphasis in original).

    A court considering a motion to compel arbitration must undertake two fundamental tasks.  First, it must determine whether the parties agreed to arbitrate their disputes.  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Corp., 473 U.S. 614, 626 (1985).  If it finds an agreement to arbitrate, it must then examine the issues in dispute to determine whether they fall within the scope of the agreement to arbitrate.  See Bercovitch v. Baldwin School, Inc., 133 F.3d 141, 148 (1st Cir. 1998) (after finding valid arbitration agreement, a court asked to compel arbitration must determine whether the agreement covers the dispute in question).

    In reviewing a contract to determine whether the parties agreed to submit their disputes to arbitration, the court must apply the federal substantive law of arbitrability to any arbitration agreement within the coverage of the Act.  Moses H. Cone Memorial Hosp., 460 U.S. at 24.  Consistent with the Act's expression of the liberal federal policy favoring arbitration, the question of the parties' intent is to be "generously construed as to issues of arbitrability."  Mitsubishi Motors Corp., 473 U.S. at 625.  Accordingly, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the

construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hosp., 460 U.S. at 24-25.

As discussed below, Acumentrics unequivocally agreed to submit all disputes arising under, in connection with or relating to its Stock Purchase Agreement with CII to arbitration. The broad scope of the Arbitration Clause encompasses all the claims CII has asserted against CII in this action.

**B.      The Stock Purchase Agreement Contains A Valid Agreement To Arbitrate.**

The Stock Purchase Agreement indisputably contains an arbitration clause that is subject to the FAA.  On its face, the Stock Purchase Agreement between a Massachusetts corporation and a public instrumentality of the State of Connecticut is an agreement that affects interstate commerce.  Just as plainly, the Stock Purchase Agreement contains a valid agreement to arbitrate.  In § 11.12 of the Stock Purchase Agreement, Acumentrics and CII agreed to arbitrate any "dispute, controversy or disputed claim arising under, in connection with or relating to this Agreement, as well as any amendment, purported amendment or termination, or any breach or violation thereof."  Stock Purchase Agreement at § 11.12.  This agreement is valid, irrevocable, and enforceable under the FAA.

**C.      The Broad Scope of the Arbitration Clause Encompasses All The Claims That Acumentrics Has Asserted Against CII In This Action.**

Each of the six counts asserted against CII in Acumentrics' Complaint arises under or in connection with or relates to the Stock Purchase Agreement.  Accordingly, to effect the federal policy favoring arbitration, this Court should compel Acumentrics to submit its claims against CII to arbitration.

1.    **Acumentrics' RICO Claims in Counts I and II Relate
to the Stock Purchase Agreement And Are Arbitrable
Under Supreme Court Precedent.**

In Counts I and II, Acumentrics asserts that unspecified defendants induced Acumentrics

to enter into the Stock Purchase Agreement and Supplier Agreement for the purpose of diverting

public money to benefit Tomasso. Complaint, ¶¶ 17 (defining "Agreements" to include the

Stock Purchase Agreement), 36, 43. In Count I, Acumentrics claims that the defendants caused

CII to acquire and maintain control over Acumentrics in violation of RICO, 18 U.S.C. § 1962(b),

and in Count II, Acumentrics claims that CII is the enterprise that was operated by the

defendants through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c).

Complaint, ¶¶ 37, 43.

Both RICO counts expressly refer to and relate to the Stock Purchase Agreement. The

Stock Purchase Agreement is alleged to be the means by which CII purportedly acquired

"control" over Acumentrics in Count I. Complaint, ¶¶ 36, 37. Similarly, in Count II, the Stock

Purchase Agreement is alleged to have been the means by which the defendants purportedly

diverted public moneys to Tomasso. Complaint, ¶¶ 42, 43.

The United States Supreme Court has unequivocally held that RICO claims are

arbitrable. Shearson/American Express Inc. v. McMahon, 482 U.S. 220, 238-242 (1987). It

observed that "there is nothing in the text of the RICO statute that even arguably evinces

congressional intent to exclude civil RICO claims from the dictates of the Arbitration Act." Id.

at 238. Nor is there any conflict between arbitration and RICO's underlying purposes; a civil

RICO plaintiff can adequately vindicate its claims in an arbitral forum. Id. at 239-242.

As the Supreme Court held in Shearson/American Express Inc., a party who has made a bargain

to arbitrate must be held to that bargain under the FAA. See id. at 242.

**2.    Acumentrics' Breach of Contract Claim in Count III Is Arbitrable.**

In Count III, Acumentrics asserts that CII breached the Stock Purchase Agreement with Acumentrics by failing, with other defendants, to provide a $3 million line of credit for equipment financing purportedly promised under § 2.7 of the Stock Purchase Agreement, which Acumentrics characterizes as the "Finance Clause."  Complaint, ¶¶ 17, 46, 47.  Count III further asserts that CII breached the implied covenant of good faith and fair dealing by fraudulently inducing Acumentrics to enter into the Agreements (including the Stock Purchase Agreement) and then by seeking to exercise its right, under § 10.2 of the Stock Purchase Agreement, to require Acumentrics to repurchase the Class B Common Stock that CII had purchased under the Stock Purchase Agreement.  Complaint, ¶ 49.

The Arbitration Clause applies by its express terms to "[a]ny dispute . . . arising under, in connection with, or relating to . . . any breach" of the Stock Purchase Agreement.  Stock Purchase Agreement, § 11.12.  Accordingly, Acumentrics must be held to its bargain to arbitrate.

The fact that the Complaint also refers to the Supplier Agreement (under which, to date, Acumentrics has received $1.5 million from CII and has failed to furnish any of the promised products) does not render the claims nonarbitrable.  Acumentrics has admitted, and the agreements themselves plainly demonstrate, that the Stock Purchase Agreement and the Supplier Agreement are inextricably "interrelated" agreements.  Complaint, ¶ 17; Stock Purchase Agreement, § 2.6.  Moreover, Acumentrics has not alleged any specific breach of the Supplier Agreement; rather, the focus of its breach of contract claims is on CII's alleged failure to provide equipment financing under § 2.7 of the Stock Purchase Agreement and on its exercise of its right to require Acumentrics to repurchase its stock under § 10.2 of the Stock Purchase Agreement.  Its only substantive allegation that even remotely touches the Supplier Agreement is its vague

assertion that CII and other defendants breached the covenant of good faith and fair dealing by fraudulently inducing it to enter the "Agreements." Complaint, ¶ 49.

Under long-established Massachusetts precedents regarding contract interpretation, "separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together." Charlestown Five Cents Savings Bank v. Zeff, 275 Mass. 408, 411-12, 176 N.E. 191 (1931). Given the strong federal policy favoring arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Memorial Hosp., 460 U.S. at 24-25; see also Personal Sec. & Safety Sys. Inc. v. Motorola Inc., 297 F.3d 388, 392-93 (5th Cir. 2002). Unlike the agreements at issue in Fit Tech, Inc. v. Bally Total Fitness Holding Corp., 374 F.3d 1, 9-11 (2004), the agreements at issue here do not contain inconsistent arbitration provisions. Thus, because any claim concerning the Supplier Agreement is inextricably interwoven with the claims arising under, in connection with, and relating to the Stock Purchase Agreement, Acumentrics must be required to arbitrate those claims. See Stock Purchase Agreement, § 11.12.

### 3.    The Usury Claim in Count IV Arises Under the Stock Purchase Agreement and Is Therefore Arbitrable.

In Count IV, Acumentrics alleges that CII's right to resell the stock to Acumentrics at a premium of 25% is "in substance an illegal debt bearing a usurious rate of interest" and purportedly a violation of M.G.L. ch. 271 § 49(a). Complaint, ¶ 51. CII's right to resell stock Acumentrics arises under §§ 10.2, 10.3, and 10.4 of the Stock Purchase Agreement. Any claim by Acumentrics arising under or relating to this right to resell stock is plainly within the scope of the Arbitration Clause. Accordingly, this claim against CII must be sent to arbitration.

4. **The Fraud Claim in Count V Must Be Arbitrated Because It Does Not Allege Fraud Relating to the Arbitration Clause.**

In Count V, Acumentrics claims that "Dietrick and the other defendants fraudulently represented to Acumentrics that they would enter into the Agreements for the legal purposes consistent with the stated mission of CII and would honor the Agreements," when their actual purpose was to divert public money and contracts to Tomasso. Complaint, ¶ 56. Count V contains no allegation that any fraudulent claim was made with specific regard to the Arbitration Clause.

The Supreme Court has held that the language of § 4 of the FAA "does not permit the federal court to consider claims of fraud in the inducement of the contract generally." Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-404 (1967). Only if the claim of fraud in the inducement relates specifically and expressly to the arbitration clause itself may a federal court consider it. Id. Relying on Prima Paint, the Massachusetts Supreme Judicial Court has similarly held that "a claim of fraud in the inducement of a contract as a whole presents a question which must be decided by arbitration." Quirk v. Data Terminal Systems, Inc., 379 Mass. 762, 767, 400 N.E.2d 858, 861 (1980). Because Acumentrics has not alleged that the Arbitration Clause itself was procured by fraud, its claim of fraud in the inducement of the Agreements generally must be referred to arbitration pursuant to § 11.12 of the Stock Purchase Agreement.

5. **The Unfair Competition Claim Against CII in Count VI Must Be Arbitrated Because It Arises Under and Relates to the Stock Purchase Agreement.**

In Count VI, Acumentrics incorporates by reference all its previous allegations. Complaint, ¶ 60. It then alleges that the "totality of the defendants' actions constitute unfair or deceptive acts in the conduct of trade or commerce in violation of M.G.L. ch. 93A §§ 2(a) and

11." Complaint, ¶ 61. Because its earlier allegations all expressly relate to the Stock Purchase Agreement, this ch. 93A claim against CII is clearly within the scope of disputes "arising under, in connection with, or relating to" the Stock Purchase Agreement and thus must be submitted to arbitration pursuant to § 11.12 of that Agreement.

### D.    Acumentrics' Claims Against Other Defendants Do Not Affect The Arbitrability of its Claims Against CII.

The Court should stay this litigation as to CII and compel Acumentrics to arbitrate its claims against CII even though Acumentrics has also asserted claims against other defendants who are not subject to the Arbitration Clause. "Under the [FAA], an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." Moses H. Cone Memorial Hosp., 460 U.S. at 20. Indeed, "the relevant federal law requires piecemeal resolution when necessary to give effect to an arbitration agreement." Id. Accordingly, the presence of Acumentrics' claims against the CDA, Diedrick, Ellef, Tomasso, TBI, and Tunxis is irrelevant to this Court's analysis of arbitrability because the "preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered, and that concern requires that [courts] rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985); see also Moses H. Cone Hosp., 460 U.S at 20. The Court must therefore enforce Acumentrics' contractual duty to arbitrate claims against CII regardless of the existence of its claims against the other defendants.

## III.    CONCLUSION

The Arbitration Clause in the Stock Purchase Agreement between Acumentrics and CII requires Acumentrics to arbitrate any claims that arise under, are connected with or relate to that Agreement. All of Acumentrics' claims against CII in this action fall within the scope of this

arbitration agreement.  Pursuant to the Federal Arbitration Act, the Court should therefore enforce the parties' agreement to arbitrate by staying this action as to CII and compelling Acumentrics to arbitrate all of its claims against CII.

CONNECTICUT INNOVATIONS,
INCORPORATED

By Its Attorneys,


/S/ James C. Rehnquist_____
James C. Rehnquist (BBO # 552602)
Rachel S. Spooner (BBO # 643626)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

Robert L. Wyld
Sheila A. Huddleston
Morgan P. Rueckert
Derek L. Mogck
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, CT  06103
(860) 251-5000

Dated:  February 11, 2005

# Acumentrics Corporation

## CLASS B COMMON STOCK PURCHASE AGREEMENT

This Agreement is made as of March 25, 2002, between Acumentrics Corporation, a Massachusetts corporation with its principal office at 14 Southwest Park, Westwood, Massachusetts 02090 (the "Company"), and Connecticut Innovations, Incorporated, a Connecticut corporation with its office at 999 West Street, Rocky Hill, Connecticut 06067 (the "Purchaser").

In consideration of the mutual covenants contained herein, the parties hereto hereby agree as follows:

## 1.0 Authorization and Sale of Common Stock

**1.1    Charter.**  The Company's Amended Articles of Organization filed with the Secretary of the State of the Commonwealth of Massachusetts (the "Certificate") authorize 15,000,000 shares of Common Stock, without par value, (i) 10,000,000 of which are designated as Class A Voting Common Stock, and (ii) 5,000,000 of which are designated as Class B Non-Voting Common Stock ("Class B Common Stock").

**1.2    Sale of Class B Common Stock.**  Subject to the terms and conditions hereof, at the Closing (as defined herein) the Company will issue and sell to Purchaser, and Purchaser will purchase from the Company, 444,444 shares of Class B Common Stock for $3,999,996, representing, after giving effect to the Warrant described in Section 2.3 hereof, approximately 3.97% of the equity issued and outstanding of the Company on a fully diluted basis (taking into account the issuance to Purchaser).  The purchase price for the Class B Common Stock being sold hereunder at the Closing is $9.00 U.S. per share. All shares of Class B Common Stock sold hereunder are referred to hereinafter as the "Shares." The Shares shall be transferred simultaneously with the execution hereof.

## 2.0 Closing Date; Delivery and Payment

**2.1    Closing and Closing Date.**  The closing of the purchase and sale of the Shares hereunder (the "Closing") shall take place simultaneously with the execution and delivery hereof at a mutually agreeable location.  The date of the Closing is hereinafter referred to as the "Closing Date."

**2.2    Delivery and Payment.**  At the Closing, the Company will deliver to Purchaser a certificate or certificates representing the Shares against payment of the purchase price therefor. The purchase price shall be payable by wire transfer made to an account designated by the Company.

**2.3    Warrant.**  After the Closing, the Company shall issue a Warrant for 46,154 shares of Class B Common Stock to the Connecticut Development Authority ("CDA").

**2.4    Board.** Until the earlier of (a) the Company successfully closing a registration under the Securities Act of 1933, as amended, or (b) the Company being subject to a significant liquidity event, such as the sale of more than fifty percent (50%) of its equity or assets, Purchaser shall have the right to have one representative attend (without voting rights) each meeting of the Board of Directors of the Company and each meeting of all committees of such Board and to participate in all discussions during each such meeting. The Company shall send to Purchaser and such designee the notice of the time and place of each such meeting (with such notice being given no later than to any other outside director), the agenda and any other materials to be discussed at the meeting and shall give Purchaser and such designee notice of each such meeting in the form and manner such notice is given to the Company's directors. The Company shall also provide to Purchaser and such designee, in a timely manner, copies of all notices, reports, minutes and consents at the time and in the manner as they are provided to the Board of Directors or committee, except for information reasonably designated as proprietary information by the Board of Directors.

**2.5    Other Transactions.** The Company shall provide the Purchaser with a copy of agreements for Class B Common Stock equity sales made by the Company within three (3) months after the Closing. In the event that any such agreement has a lower price per Share or terms and conditions (other than voting rights) which are more beneficial to the purchaser than the terms and conditions contained herein, this Agreement shall be amended so that the Purchaser shall have the benefit of such lower price or such more beneficial terms and conditions. The Company represents and warrants to the Purchaser that the terms and conditions contained herein, other than with respect to voting rights, are as favorable to the Purchaser as the terms and conditions granted by the Company, to (a) Texaco Energy Systems, Inc. in connection with its equity purchase from the Company and (b) NiSource Energy Technologies in connection with its equity purchase from the Company.

**2.6    Supplier Agreement.** Simultaneously with the Closing, the Company and Purchaser shall execute and deliver a Supplier Agreement with respect to certain Company products.

**2.7    Loan.** After the Closing, the CDA shall loan the Company $3,000,000 for capital equipment and other related purchases on mutually agreeable terms and conditions.

**3.0 Representations and Warranties of the Company**

Except as set forth on the Disclosure Schedule attached as Exhibit A, which exceptions shall be deemed an integral part of the representations and warranties hereunder, the Company hereby represents and warrants to the Purchaser as follows:

**3.1    Organization and Good Standing; Certificate and By-Laws.**

(a)    The Company is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts. The Company has the

requisite corporate power to own and operate its properties and assets, and to carry on its business as presently conducted and as presently proposed to be conducted. The Company is qualified to do business as a foreign corporation in no states, and the failure to be so qualified does not and will not have a material adverse effect on the business, prospects, properties, assets, financial condition or results of operations of the Company (hereinafter, a "Material Adverse Effect"). True and complete copies of the Certificate and by-laws of the Company (the "by-laws"), each as in effect on the Closing Date, have been made available to the Purchaser or its counsel.

(b)    The subsidiaries of the Company are duly organized, validly existing and in good standing under the laws of their jurisdiction of incorporation. Each such subsidiary has the requisite corporate power to own and operate its property and assets and to carry on its business as presently conducted and as presently proposed to be conducted. True and complete copies of the organizational documents of each subsidiary, each as in effect on the Closing Date, have been made available to the Purchaser or its counsel.

**3.2    Corporate Power.**  The Company has all requisite legal and corporate power to execute and deliver this Agreement, the Warrant and the other documents and instruments contemplated hereby (collectively the "Purchase Agreements"), to sell and issue the Shares hereunder, and to carry out and perform its obligations under the terms of this Agreement and the Purchase Agreements.

**3.3    Subsidiaries.**  Except as set forth in Section 3.3 of the Disclosure Schedule, the Company has no subsidiaries or affiliated companies and does not otherwise own or control, directly or indirectly, any other corporation, association or business entity. The Company is not a party to any joint venture agreements or a participant in any partnerships.

**3.4    Capitalization.**  Immediately prior to the Closing, the authorized capital stock of the Company consists of 15,000,000 shares of Common Stock, of which 10,000,000 have been designated as Class A Voting Common Stock, 6,863,666 of which are issued and outstanding, and of which 5,000,000 have been designated Class B Non-Voting Common Stock, 3,658,998 of which are issued and outstanding. No shares of Common Stock are held in the treasury of the Company. All issued and outstanding shares of Common Stock have been duly authorized and validly issued, and are fully paid and nonassessable. The Company has also reserved 1,743,000 shares of Class B Common Stock for issuance to officers, directors, employees and consultants of the Company pursuant to the Company's 1995 Stock Option Plan, of which 1,473,500 options have been granted. The Company has reserved the required shares of stock for the warrants specified in Section 3.4 of the Disclosure Schedule. The Class B Common Stock shall have the rights, preferences, privileges and restrictions set forth in the Certificate. Section 3.4 of the Disclosure Schedule sets forth a true and correct list of all outstanding securities of the Company (including the amounts thereof) immediately prior to the Closing and the names of the holders of any interest in such securities (including the amount and percentage owned by each such holder). Other than as set forth therein, and except as may be granted pursuant to this Agreement, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights

-3-

of first refusal), proxy or stockholder agreements, or agreements of any kind for the purchase or acquisition from the Company of any of its securities. Other than as set forth in the Company's Employment Agreement with Gary A. Mook, the Company is not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any convertible securities, rights, or options. Other than as set forth in certain rights of first refusal provided by certain stockholders of the Company to Gary A. Mook, which rights are subordinate to Article V of the Certificate and other than set forth in Section 3.4 of the Disclosure Schedule, no holder of any securities in the Company has granted any option or other right to purchase from such holder any interest in any share of Common Stock other than as contemplated by this Agreement. All issued and outstanding shares of the Company's Common Stock (i) have been duly authorized and validly issued to the persons and in the amounts listed in Section 3.4 of the Disclosure Schedule and are fully paid and nonassessable, and (ii) were offered, issued, sold and delivered by the Company in compliance with all applicable state and federal laws concerning the issuance of securities, the Certificate and the By-Laws. The rights, preferences, privileges and restrictions of the Shares shall be as stated in the Certificate. When issued in compliance with the provisions of this Agreement, the Shares will be duly and validly issued, fully paid and nonassessable, will be free of any liens, encumbrances or restrictions on transfer other than restrictions on transfer under this Agreement and under applicable state and federal securities laws, and will have been offered, issued, sold and delivered by the Company in compliance with all applicable state and federal laws concerning the issuance of securities, the Certificate and the By-Laws.

Except as set forth in Section 3.4 of the Disclosure Schedule or set forth in the Certificate or By-Laws of the Company, the Company is not a party to or subject to any agreement or understanding and there are no agreements or understandings between any persons that affects or relates to the voting or giving of written consents with respect to any security of the Company or the voting by a director of the Company.

   **3.5    Authorization.** All corporate action on the part of the Company, its directors and stockholders necessary for the authorization, execution, delivery and performance of this Agreement and the Purchase Agreements by the Company, and the authorization, sale, issuance and delivery of the Shares, have been taken or will be taken prior to the Closing. This Agreement and the Purchase Agreement, when executed and delivered by the Company, shall constitute the valid and binding obligations of the Company, enforceable in accordance with their respective terms, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors and rules of law governing specific performance, injunctive relief or other equitable remedies. The Shares, when issued in compliance with the provisions of this Agreement, will be validly issued, fully paid and nonassessable and free of any liens or restrictions on transfer other than the restrictions on transfer specified in the Certificate or the By-laws of the Company; provided, however, that all of such Shares may be subject to restrictions on transfer under state and/or federal securities laws as set forth herein. Except as set forth in Section 3.5 of the Disclosure Schedule, none of the Shares are subject to any preemptive rights or rights of first refusal, except as may be provided in this Agreement.

-4-

**3.6**    **Litigation, etc.**  Except as set forth in Section 3.6 of the Disclosure Schedule, there are no actions, suits, proceedings or investigations pending or, to the Company's knowledge, threatened against the Company, its subsidiaries or their respective properties before any court or governmental agency or any arbitrator, nor is the Company or its subsidiaries subject to any writ, injunction or order of any court or government agency or any order of any arbitrator (nor, to the Company's knowledge, is there any basis therefor or threat thereof).  The Company and its subsidiaries have no current plan to initiate any action, suit, proceeding or investigation before any court or government agency.  The Company has no pending or proposed claims against Purchaser or any of Purchaser's affiliates.

**3.7**    **Offering Exemption.**  Subject to the accuracy of the Purchaser's representations in Article 4 hereof, the offer, sale and issuance of the Shares constitute or will constitute transactions exempt from the registration requirements of any applicable state and federal securities laws including but not limited to Section 5 of the Securities Act of 1933 (the "Securities Act").

**3.8**    **Brokers or Finders.**  The Company has not incurred, and will not incur, directly or indirectly, any liability for brokerage or finders' fees or similar charges in connection with this Agreement or any transaction contemplated hereby.

**3.9**    **Use of Proceeds.**  The Company intends to use the net proceeds from this offering for general working capital and to assist in achieving production goals for the Company's various product lines including purchases of certain capital equipment, building leasehold improvements, and general engineering equipment.

**3.10**    **Financial Statements.**  The Company has made available to Purchaser (a) final drafts of its audited balance sheet as of December 31, 2001 and its audited statement of income and cash flows for the period beginning January 1, 2001 and ending December 31, 2001, and (b) its unaudited balance sheet as at January 31, 2002 (the "Statement Date") and unaudited consolidated statement of income and cash flows for the twelve (12) month period ending on the Statement Date (collectively, the "Financial Statements"), copies of which have been provided to Purchaser.  The Financial Statements, together with the notes thereto, are complete and correct in all material respects, have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods indicated and present fairly the financial condition and position of the Company as of the Statement Date and the periods indicated on the Financial Statements.

**3.11**    **Liabilities.**  (a) Except as set forth in the Financial Statements, the Company has no liabilities, whether accrued or absolute, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to the Statement Date, and (ii) obligations under contracts and commitments incurred in the ordinary course of business and not required under generally accepted accounting principles to be reflected in the Financial Statements, which, in both cases, individually or in the aggregate, are not material to the financial condition or operating results of the Company.

(b)    Since February 1, 2002, (i) except as set forth in the Disclosure Schedule, the Company has conducted its business and operations in the ordinary course of business in a manner consistent with prior practice, and (ii) the Company has not experienced any change which, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

**3.12    Title to Properties and Assets; Liens, Etc.**  The Company and its subsidiaries have good and marketable title to their respective properties and assets, including the properties and assets reflected in the most recent balance sheet included in the Financial Statements, and good title to its leasehold estates, in each case subject to no mortgage, pledge, lien, security interest, conditional sale agreement, lease, encumbrance or charge, other than those resulting from taxes that have not yet become delinquent and those set forth in Section 3.12 of the Disclosure Schedule.  All facilities, machinery, equipment, fixtures, vehicles and other properties owned, leased or used by the Company are in good operating condition and repair, ordinary wear and tear excepted, and are fit and usable for the purposes for which they are being used.  The Company is in compliance with all material terms of each lease listed in Section 3.12 of the Disclosure Schedule to which it is a party or is otherwise bound.  The Company enjoys peaceful and undisturbed possession under all leases under which it is operating, and all such leases are valid and subsisting in full force and effect.

**3.13    Intellectual Property.**

(a)    The Company has good and marketable title and ownership to or is licensed under all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information and other proprietary rights and processes that are used in or related to its business as now conducted and as presently proposed to be conducted (collectively, the "Intellectual Property"), without any conflict with or infringement of the rights of others, free and clear of all liens, charges and encumbrances.  The registered Intellectual Property owned by the Company is set forth in Section 3.13(a) of the Disclosure Schedule.  There are no outstanding options, licenses or agreements of any kind relating to the foregoing proprietary rights, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information and other proprietary rights and processees of any other person or entity, the effect of which in any individual case or in the aggregate would be materially adverse to the business of the Company as now conducted or proposed to be conducted.  The Company has taken all reasonable and appropriate actions to maintain and protect the Intellectual Property which it owns or uses.  In particular, the Company has applied for patents for various of its fuel cell and flywheel technology and has no reason to believe that such patents will not be issued to the Company in due course.  No loss or expiration of any Intellectual Property is pending or to the best of the Company's knowledge, threatened.  Except as specified in Section 3.13(a) of the Disclosure Schedule, the Company is not obligated to make any payments by way of royalties, fees or otherwise to any owner, licensor of, or other claimant to any patent, trademark, trade name, copyright or other intangible assets, with respect to the use thereof or in connection with the conduct of its business, or otherwise.

(b)     The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently proposed, might violate any of the patents, trademarks, service marks, trade names, copyrights or trade secrets or other proprietary rights of any other person or entity, nor is the Company aware of any such violation or basis for any such communication. Except as set forth in Section 3.13(b) of the Disclosure Schedule, the Company is not aware of any third party which is in violation of any Intellectual Property rights of the Company and the Company has not, except as set forth in Section 3.13(b) of the Disclosure Schedule, communicated with any third party regarding any such violation.

(c)     The Company has not received any communications contesting the validity or right of the Company to use any of the Intellectual Property, nor is the Company aware of a basis therefor.

(d)     To the Company's knowledge, none of its employees, suppliers, consultants or agents is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with their duties to the Company or that would conflict with the Company's business as presently proposed to be conducted. To the knowledge of the Company, each former employee, consultant or agent who in any way supervised the development of, or developed the Intellectual Property, and each key current employee, officer, consultant, agent and director of the Company has executed a proprietary information and inventions agreement with the Company and has not excluded works or inventions from his or her assignment of inventions pursuant to such individual's proprietary information and inventions agreement. The Company does not believe it is or will be necessary to utilize any inventions, trade secrets or proprietary information of any of its employees, consultants or agents made prior to their employment by the Company, except for inventions, trade secrets or proprietary information that have been assigned to the Company.

(e)     Neither the execution nor delivery of this Agreement and the Purchase Agreements, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as presently proposed, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which any employee is now obligated.

**3.14    Compliance with Other Instruments.** The Company is not in violation or default of any term of its Certificate or its by-laws, and the subsidiaries of the Company are not in violation or default of any provision of their respective organizational documents. The Company is not in violation or default of any judgment, decree, order or writ. The subsidiaries of the Company are not in violation of any order, judgment, decree or writ. The Company is not in violation or default under any agreements with any third party in any material respect. The subsidiaries of the Company are not in violation or default under any agreements with any third party in any material respect. The execution, delivery, and performance of and compliance with this Agreement and the Purchase Agreements, and the issuance and sale of the Shares pursuant

-7-

hereto, will not, with or without the passage of time or giving of notice, result in any such violation, or be in conflict with or constitute a default under any such term, or result in the creation of any mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company or the suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. The Company has avoided every condition, and has not performed any act, the occurrence of which would result in the Company's loss of any material right granted under any license, distribution agreement or other agreement. There is no agreement, obligation, instrument or transaction to which the Company is a party which materially adversely affects the business conditions, affairs or operations of the Company or its assets and properties.

     **3.15**    <u>Tax Returns and Payments.</u>  The Company has timely filed all tax returns (federal, state and local) required to be filed by it. All taxes shown to be due and payable on such returns, any assessments imposed, and all other taxes due and payable by the Company on or before the Closing, have been paid or will be paid prior to Closing. All tax returns filed by the Company are true, complete and correct, all tax returns filed by the Company reflect all taxes which were then due and the Company has paid all taxes reflected on such tax returns. The Company has not been advised (a) that any of its returns, federal, state or other, have been or are being audited as of the date hereof, or (b) of any deficiency in assessment or proposed judgment to its federal, state or other taxes. The Company has no liability for any tax to be imposed upon its properties or assets as of the date of this Agreement that is not adequately provided for. The Company has withheld or collected from each payment made to each of its employees, the amount of all taxes (including, but not limited to, federal income taxes, Federal Insurance Contribution Act taxes and Federal Unemployment Tax Act taxes) required to be withheld or collected therefrom, and has paid the same to the proper tax receiving officers or authorized depositaries. The Company has not elected to be treated as a Subchapter S corporation under the Internal Revenue Code of 1986, as amended (the "Code"). There are not security interests on any of the assets of the Company that arose in connection with any failure (or alleged failure) to pay any taxes and there are no liens for any tax upon any asset of the Company. No material claim has ever been made by any taxing authority with respect to the Company in a jurisdiction where the Company does not file tax returns that the Company is or may be subject to taxation by that jurisdiction. No extension of time with respect to any date on which a tax return was or is to be filed by the Company is in force, and no waiver or agreement by the Company is in force for the extension of time for the assessment or payment of any taxes. The Company is not, and has never been, a party to any agreement relating to allocating or sharing the payment of, or liability for, taxes with respect to any taxable period (or portion thereof). The Company is not a party to any contract, agreement, plan or arrangement that, individually or in the aggregate, or when taken together with any payment that may be made under this Agreement or any agreements contemplated hereby, could give rise to the payment of any "excess parachute payment" within the meaning of Section 280G of the Code. The Company is not, and has never been, a personal holding company within the meaning of Section 542 of the Code.

**3.16   Employees.** The Company has no collective bargaining agreements with any of its employees. There is no labor union organizing activity pending or, to the Company's knowledge, threatened with respect to the Company. Except as set forth in Section 3.16 of the Disclosure Schedule, the Company is not a party to or bound by any currently effective deferred compensation arrangement, bonus plan, incentive plan, profit sharing plan, retirement agreement or other employee compensation plan or agreement, and the Company does not otherwise have or contribute to or participate in or have any liability with respect to any Employee Benefit Plan as defined in the Employee Retirement Income Security Act of 1974, as amended. If implemented, the new Employee Benefit Plans described in Section 3.16 of the Disclosure Schedule will be substantially similar in terms of benefits and other items to the Employee Benefit Plans currently in place for the Company. Neither the Company nor any entity that is or was at any time treated as a single employer with the Company under Section 414(b), (c), (m) or (o) of the Code (an "ERISA Affiliate") has at any time maintained, contributed to or been required to contribute to, or had any liability with respect to, any plan which is subject to Title IV of ERISA or Section 412 of the Code (including, without limitation, any multiemployer plan (within the meaning of Section 3(37) of ERISA)). To the Company's knowledge, no employee of the Company, nor any consultant with whom the Company has contracted, is in violation of any term of any employment contract, proprietary information agreement or any other agreement relating to the right of any such individual to be employed by, or to contract with, the Company because of the nature of the business to be conducted by the Company; and to the Company's knowledge the continued employment by the Company of its present employees, and the performance of the Company's contracts with its independent contractors, will not result in any such violation. The Company is not in material violation of any such agreements. The Company has not received any notice alleging that any such violation has occurred. No employee of the Company has been granted the right to continued employment by the Company, other than as set forth in Section 3.16 of the Disclosure Schedule, or to any material compensation following termination of employment with the Company, but there would be no material adverse effect on the Company from any such agreements. The Company is not aware that any officer, key employee or group of employees intends to terminate his, her or their employment with the Company, nor does the Company have a present intention to terminate the employment of any officer, key employee or group of employees. The Company is in full compliance with all laws regarding employment, wages, hours, equal opportunity, collective bargaining and payment of Social Security and other taxes. The Company is in compliance with all applicable foreign, federal, state and local laws and regulations regarding occupational safety and health standards and has received no complaints from any foreign, federal, state or local agency or regulatory body alleging violations of any such laws and regulations. The Company is a party to the binding employment agreements set forth in Section 3.16 of the Disclosure Schedule. The Company is a party to severance agreements with Nigel Sammes and Jonathan Wood. Such employment and severance agreements are in full force and effect and copies thereof have been provided to Purchaser.

**3.17   Compliance with Laws; Permits.** The Company is not in violation in any material respect of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties. No governmental orders, permissions, consents,

-9-

approvals or authorizations are required to be obtained and no registrations or declarations are required to be filed in connection with the performance, execution and delivery of this Agreement and the issuance of the Shares, except for those set forth on Section 3.17 of the Disclosure Schedule, all of which have been duly and validly obtained or filed, or with respect to any filings that must be made after the Closing, as will be filed in a timely manner within the applicable periods. The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business as now being conducted by it, and believes it can obtain, without undue burden or expense, any similar authority for the conduct of its business as planned to be conducted. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authorities.

**3.18** **Environmental and Safety Laws.** The Company is not in violation of any applicable statute, law or regulation relating to the environment or occupational health and safety, and to its knowledge, no material expenditures are or will be required in order to comply with any such existing statute, law or regulation. Hazardous Materials (as defined below) are used and have been used, stored, and disposed of by the Company in its operations, all in accordance with applicable law, and such use by the Company does not materially adversely affect the business of the Company. For the purposes of the preceding sentence, "Hazardous Materials" shall mean (a) materials that are listed or otherwise defined as "hazardous" or "toxic" under any applicable local, state, federal and/or foreign laws and regulations that govern the existence and/or remedy of contamination on property, the protection of the environment from contamination, or the control of hazardous waste or other activities involving hazardous substantives, including building materials, or (b) any petroleum products or nuclear materials. The Company has not received any written complaint or written notice asserting potential liability under, or requesting information from the Company with respect to, any environmental laws.

**3.19** **Contracts and Other Commitments**. Except as set forth in the Disclosure Schedule, there are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company is a party or to its knowledge by which it is bound which may involve provisions restricting the development, manufacture or distribution of the Company's products or services.

**3.20** **Material Contracts and Commitments**. All of the Company's material contracts are listed in Section 3.20 of the Disclosure Schedule and are valid, binding and in full force and effect in all material respects and enforceable by the Company in accordance with their respective terms in all material respects, subject to the effect of applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, usury or other laws of general application relating to or affecting enforcement of creditors' rights and rules or laws concerning equitable remedies. Neither the Company nor any other party thereto is in default or breach in any material respect and, to the best knowledge of the Company, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default thereunder in each case.

-10-

**3.21    Disclosure.** Neither this Agreement, the exhibits hereto, nor any other document delivered by the Company to Purchaser or its attorneys or agents in connection herewith or therewith or with the transactions contemplated hereby or thereby, contain any untrue statement of a material fact nor, omit to state a material fact necessary in order to make the statements contained herein or therein not misleading. To the Company's knowledge, there are no facts which (individually or in the aggregate) materially adversely affect the business, assets, liabilities, financial condition, or operations of the Company that have not been set forth in this Agreement, the exhibits hereto, or in other documents delivered to Purchaser or its attorneys or agents in connection herewith and referenced herein. The Company does not have any knowledge or belief that (i) there is pending or threatened any claim or litigation against or affecting the Company contesting its right to manufacture, sell or use any product or service presently manufactured, sold or used or planned to be manufactured, sold or used by the Company, (ii) there exists, or there is pending or planned, any statute, rule, law, regulation, standard or code which would materially adversely affect the condition, financial or otherwise, the operations or the prospects of the Company or (iii) there is any other fact relating to the operations of the Company which in the future may materially adversely affect the Company's condition, financial or otherwise, operations or prospects.

**3.22    Registration Rights.** Section 3.22 of the Disclosure Schedule sets forth the entities which possess registration rights with respect to the securities of the Company.

### 4.0 Representations, Warranties and Covenants of the Purchaser

Purchaser hereby represents, warrants and covenants to the Company with respect to the purchase of the Shares as follows:

**4.1    Experience; Risk.** The Purchaser has such knowledge and experience in financial and business matters that such Purchaser is capable of evaluating the merits and risks of the purchase of the Shares, pursuant to this Agreement and of protecting the Purchaser's interests in connection herewith. The Purchaser has the ability to bear the economic risk of the investment, including complete loss of the investment.

**4.2    Accredited Investor.** The Purchaser presently does and will as of the Closing Date qualify as an "accredited investor" within the meaning of Regulation D (17 C.F.R. § 230.501) of the rules and regulations promulgated under the Securities Act.

**4.3    Investment.** The Purchaser is acquiring the Shares for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, any distribution thereof, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. The Purchaser understands that the Shares neither have been nor will be registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Purchaser's representations as expressed herein.

277250

**4.4    Restricted Securities; Rule 144.**  The Purchaser understands that the Shares are characterized as "restricted securities" under the federal securities laws since they are being acquired from the Company in a transaction not involving a public offering, and that under such laws and applicable regulations such securities may be resold without registration under the Securities Act only in certain limited circumstances.  The Purchaser acknowledges that such securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. The Purchaser is aware of the provisions of Rule 144 (17 C.F.R. § 230.144) promulgated under the Securities Act ("Rule 144") which permit limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions.

**4.5    No Public Market.**  The Purchaser understands that no public market now exists for any of the securities issued by the Company and that there can be no assurance that a public market will ever exist for the Shares.

**4.6    Access to Data.**  The Purchaser has had an opportunity to discuss the Company's business, management results of operations and financial affairs with the Company's management and the opportunity to inspect the Company's facilities.

**4.7    Authorization.**  The Purchaser has the full right, power and authority to enter into and perform the Purchaser's obligations under this Agreement and this Agreement, when executed and delivered by the Purchaser, will constitute valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the laws of general application relating to bankruptcy, insolvency and the relief of debtors, rules of law governing specific performance, injunctive relief and other equitable remedies.

**4.8    Government Consents.**  No consent, approval or authorization of or designation, declaration or filing with any state, federal, or foreign governmental authority on the part of the Purchaser is required in connection with the valid execution and delivery of this Agreement by the Purchaser, or the consummation by the Purchaser of the transactions contemplated hereby and thereby.

**4.9    Further Limitations on Disposition.**  Without in any way limiting the representations set forth above, the Purchaser further agrees not to make any disposition of all or any portion of the Shares unless and until:

(a)    there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

-12-

(b)      the Purchaser shall have (i) notified the Company of the proposed disposition and (ii) furnished the Company with a detailed statement of the terms and conditions of the proposed disposition, and (iii) if reasonably requested by the Company, furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Securities Act.

Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be required (i) for a transfer not involving a change in beneficial ownership, (ii) in transactions involving the distribution without consideration of securities by the holder thereof to any of its partners, or retired partners, or to the estate of any of its partners or retired partners, (iii) in transactions involving the transfer without consideration of securities by the holder thereof during his or her lifetime by way of gift or on death by will or intestacy, (iv) in transactions involving the transfer or distribution of securities by a corporation to any subsidiary, parent or affiliate of such corporation, and (v) in transactions in compliance with Rule 144.

4.10    **Legends.**  It is understood that each certificate representing the Shares and any securities issued in respect thereof or exchanged therefor, shall bear legends in the following form (in addition to any legend required under applicable state securities laws):

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. NO SALE OR DISPOSITION OF THESE SECURITIES MAY BE EFFECTED WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY AND WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT."

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS UPON TRANSFER AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY."

The legends set forth above shall be removed by the Company from any certificate evidencing shares transferred in connection with a disposition permitted under Section 4.9 ("Purchased Shares") upon delivery to the Company of an opinion of counsel, reasonably satisfactory to the Company, that a registration station under the 1933 Act is at that time in effect with respect to the legended security or that such security can be freely transferred in a public sale without such a registration statement being in effect; provided, however, that no such opinion of counsel shall be required in connection with a request for such removal in connection with any transfer of Purchased Shares in compliance with Rule 144.

-13-

**4.11    Brokers or Finders.**  The Purchaser has not incurred, and will not incur, directly or indirectly, any liability for brokerage or finders' fees or any similar charges in connection with this Agreement or any transaction contemplated hereby.

### 5.0 Purchaser's Conditions to Closing

The obligation of Purchaser to consummate the transactions contemplated hereby is subject to the fulfillment or waiver of the following conditions on or before the Closing Date:

**5.1    Opinion of Company's Counsel.**  The Purchaser shall have received from Hutchins, Wheeler & Dittmar, A Professional Corporation, counsel to the Company, an opinion addressed to the Purchaser, dated the Closing Date, in mutually agreeable form.

**5.2    Certificate of Good Standing.**  The Company shall have delivered to the Purchaser a corporate Certificate of Good Standing from the Commonwealth of Massachusetts and dated a reasonably recent date.

**5.3    Blue Sky.**  Except for post-sale notices, the Company shall have obtained all necessary Blue Sky law permits and qualifications, or secured an exemption therefrom, required by any state for the offer and sale of the Shares.

**5.4    Board Approval.**  This Agreement, the Purchase Agreements and the issuance of the Shares to the Purchaser will have been duly approved by the Company's Board of Directors in accordance with the applicable laws and the Company's by-laws and Certificate.

**5.5    Legal Investment.**  On the Closing Date, the sale and issuance of the Shares shall be legally permitted by all laws and regulations to which Purchasers and the Company are subject.

**5.6    Consents, Permits, and Waivers.**  The Company shall have obtained, and delivered to Purchaser evidence of, any and all authorizations, consents, permits and waivers necessary or appropriate for consummation of the transactions contemplated by this Agreement and the Purchase Agreements.

**5.7    Corporate Documents.**  The Company shall have delivered to Purchaser copies of all corporate documents of the Company as Purchaser shall reasonably request.

**5.8    Clerk's Certificate.**  The Purchaser shall have received from the Company's Clerk, a certificate having attached thereto (i) the Company's Certificate as in effect at the time of the Closing, (ii) the Company's by-laws as in effect at the time of the Closing, and (iii) resolutions approved by the Board of Directors authorizing the transactions contemplated hereby.

**5.9    Incumbency Certificate.**  Purchaser shall have received a certificate of the Company dated as of the Closing Date certifying the incumbency of the officers of the Company signing for it and as to the authenticity of their signatures.

-14-

## 6.0    Affirmative Covenants of the Company.

The Company hereby covenants and agrees as follows:

**6.1    Annual and Quarterly Financial Information.** The Company will furnish to Purchaser for so long as such Purchaser continues to be the holder of at least 100,000 shares of Class B Common Stock:

(a)    as soon as practicable after the end of each fiscal year, and in any event within 120 days thereafter, a consolidated balance sheet of the Company and its subsidiaries, if any, as of the end of such fiscal year, and consolidated statements of operations and statements of cash flow of the Company and its subsidiaries, for such year, each of which shall be audited by an accounting firm of national reputation, and all of which shall be prepared in accordance with generally accepted accounting principles consistently applied; and

(b)    as soon as practicable after the end of the first, second and third quarterly accounting periods in each fiscal year of the Company, and in any event within 60 days thereafter, a consolidated balance sheet of the Company and its subsidiaries, if any, as of the end of each such quarterly period, and consolidated statements of operations and statements of cash flow of the Company and its subsidiaries for such period and for the current fiscal year to date, prepared in accordance with generally accepted accounting principles consistently applied, except for the absence of normal audit adjustments and the absence of other supporting statements, schedules and footnotes; and

(c)    Company will reasonably share annual forecast data prior to an initial public offering ("IPO") or major liquidity event, but in no event shall such information be relied upon for any investment or similar transactions in or with the Company with regard to an IPO or similar event.

(d)    Prior to an IPO, Purchaser shall have the right to visit and inspect any of the properties of the Company or any of its subsidiaries, and to discuss the affairs, finances and accounts of the Company or any of its subsidiaries with its officers, and to review such information as is reasonably requested, all at such reasonable times upon reasonable notice and as often as may be reasonably requested.

**6.2    Confidentiality of Information.** Any information obtained by Purchaser pursuant to Section 6.1 which is, or would reasonably be perceived to be, proprietary to the Company or otherwise confidential will not be disclosed without the prior written consent of the Company. The following will not constitute confidential information for purposes of this Section 6.2: (a) information that was already in Purchaser's possession prior to receipt from the Company; (b) information that is obtained by Purchaser from a third person who, insofar as is known to Purchaser, has no obligation of confidentiality with respect thereto; (c) information that is or becomes publicly available through no fault of Purchaser; and (d) information that is generally made available by the Company to third parties without restriction. Purchaser further

-15-

acknowledges and understands that any information so obtained which may be considered "inside" non-public information will not be utilized by the Purchaser in connection with purchases and/or sales of the Company's securities, except in compliance with applicable state and federal anti-fraud statutes. Company acknowledges that Purchaser may be required to disclose certain or all Company proprietary or otherwise confidential information to regulatory or other similar government agencies, or to the Connecticut legislature and/or its committees or agents or to other persons, as required by statute, regulation or otherwise or if so ordered or requested by the same. Purchaser will use reasonable effort to notify Company prior to such disclosures.

6.3    **Related Party Transactions.**  The Company shall not enter into any transaction with any of its directors, officers or employees, or any entity in which any of them have a direct or indirect ownership interest, except as may be approved in advance by a majority of the disinterested directors then serving on the Board and on terms not materially less favorable to the Company than could otherwise have been obtained in arms' length negotiations.

6.4    **Termination of Covenants.**  The covenants of the Company set forth in Sections 6.1 and 6.3 shall terminate upon the earliest of (i) the closing of a firm commitment underwritten public offering pursuant to an effective registration statement under the Securities Act covering the offer and sale of Common Stock for the account of the Company to the public, or (ii) the effective date of the registration of the Company's Common Stock under Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), other than in connection with the public offering described in the preceding clause (i)(in either case, a "Public Offering").

6.5    **Move to Connecticut**.  The Company shall move its manufacturing operations to the State of Connecticut no later than eighteen months after the Closing, TIME BEING OF THE ESSENCE, and the Company shall use reasonable efforts to make such move to the State of Connecticut at an earlier date if circumstances permit. For such purpose, the move of manufacturing operations shall mean that all of the Company's full-scale manufacturing for all of its products shall be in facilities located in Connecticut (and the place of employment of all employees engaged directly in full-scale manufacturing shall be Connecticut), and the installation of high temperature furnaces in such facilities shall have occurred.  Until the Company shall have effected the Relocation (as defined in Section 10.1) or honored in full any Notice of Put (as defined and described in Section 10.2), the Company shall not seek or accept any direct or indirect funding from any state or its agencies or instrumentalities for assisting the Company in forming, setting-up, developing, constructing, moving or otherwise assisting the Company's manufacturing operations outside of Connecticut.

6.6    **Conversion of Shares**.  The Company agrees that the Shares (and all shares issued to the Purchaser as a dividend or distribution thereon) shall automatically be converted on a one-for-one basis into shares of Class A Common Stock immediately following the closing of a Public Offering.

-16-

277250

## 7.0 Registration Rights

If the Company at any time proposes to file a registration statement with respect to its Common Stock, whether (i) for its own account (other than a registration statement on Forms S-4 or S-8 (or any successor or substantially similar form), and other than in connection with (A) employee benefit plans, stock purchase or compensation plan or of securities issued or issuable pursuant to any such plans, (B) a dividend reinvestment plan, or (C) a "shelf" registration (pursuant to Rule 415 under the Securities Act) or (ii) for the account of another holder that have requested such registration (a "Requesting Securityholder"), then the Company shall in each case give written notice of such proposed filing to the Purchaser at least thirty (30) days before the anticipated filing date of any such registration statement by the Company, and such notice shall offer to the Purchaser the opportunity to have any or all of the Common Stock held by the Purchaser included in such registration statement. The Purchaser shall advise the Company in writing within fifteen (15) days after the date of receipt of such notice of the amount of Common Stock for which Purchaser requests registration, and the Company shall include in any such registration statement all such Common Stock so requested to be included in such registration statement. Notwithstanding the foregoing, if the managing underwriter or underwriters of any such proposed public offering advises the Company in writing that the total amount or kind of securities which the Purchaser, the Company and any other persons intended to be included in such proposed public offering is sufficiently large to adversely affect the success of such proposed public offering, then the amount or kind of securities to be offered for the accounts of the Purchaser and the other holders shall be reduced pro rata, to zero if necessary, based upon the aggregate number of securities to be offered for the accounts of the Purchaser and all other holders (except the Company and the Requesting Securityholder) of securities intended to be included in such offering and the number or kind of securities to be offered for the account of the Purchaser and each other holder, to the extent necessary to reduce the total amount or kind of securities to be included in such proposed public offering to the amount or kind recommended by such managing underwriter or underwriters before the securities offered by the Company or any Requesting Securityholder are so reduced. Anything to the contrary in this Agreement notwithstanding, the Company may withdraw or postpone a registration statement referred to in this Article 7 at any time before it becomes effective or withdraw, postpone or terminate the offering after it becomes effective without obligation to the Purchaser.

## 8.0    Indemnification.

The Company agrees to indemnify Purchaser and each officer, director, employee, agent, partner, member, manager, stockholder and affiliate of Purchaser (collectively, the "Indemnified Parties") for, and hold each Indemnified Party harmless from and against, any and all damages, losses, claims and other liabilities of any and every kind, including, without limitation, judgments and costs of settlement, and any and all reasonable out-of-pocket costs and expenses of any and every kind, including, without limitation, reasonable fees and disbursements of counsel for such Indemnified Parties  (all of which expenses periodically shall be reimbursed as incurred) in each case, arising out of or suffered or incurred in connection with any of the following: (a) any

-17-

277250

misrepresentation or any breach of any warranty made by the Company herein or in any of the other agreements entered into in connection with the transactions contemplated hereby, (b) any breach or non-fulfillment of any covenant or agreement made by the Company herein or in any of the other agreements entered into in connection with the transactions contemplated hereby, and (c) any claim relating to or arising out of a violation of applicable federal or state securities laws by the Company in connection with the sale or issuance of the Shares by the Company to the Purchaser; provided, however, that (x) the total liability of the Company under this Section 7.2, except for fraud, willful misconduct or gross negligence, shall not exceed $5,000,000 and this Section 7.2 shall provide the sole remedy of Purchaser in connection with such matters, except for fraud, willful misconduct or gross negligence; (y) no claim shall be brought under this Section 7.2 until the aggregate of all claims equals at least $100,000; and (z) the representations and warranties of the Company contained in this Agreement shall survive for two (2) years after the date hereof; provided, however, that Sections 3.15 and 3.18 hereof shall survive for five (5) years after the date hereof. In the case of third party claims against the Purchaser, the Purchaser shall have the right to participate in or control any such action at their own expense with counsel reasonably acceptable to the Company, and the Company shall have the right (but not the duty) to participate in the defense thereof, which shall be at the Company's expense, unless the Purchaser does not assume the defense, in which case such defense shall be at the expense of the Purchaser. Neither party shall settle any such action unless the other party consents in writing to such settlement, which consent shall not be unreasonably withheld.

## 9.0 <u>Right of First Refusal on Company Issuance</u>

### 9.1    <u>Right of First Refusal.</u>

The Company hereby grants to Purchaser, as long as Purchaser then holds at least 444,444 shares of Class B Common Stock (as adjusted for any stock splits, stock dividends and the like) the right of first refusal to purchase such amount of New Securities (as defined in this Article 9) which the Company may, from time to time, propose to sell, grant and issue so as to cause Purchaser to maintain in the aggregate up to a 3.97% interest in the Company on a fully diluted basis, provided that, if the Company redeems or acquires over ten percent (10%) of its equity, this Section 9.1 shall apply to the Purchaser's then current percentage interest on a fully diluted basis rather than to such 3.97%.

### 9.2    <u>Definition.</u>

"New Securities" shall mean any shares of capital stock of the Company, including, without limitation, Common Stock and preferred stock, whether now authorized or not, and all rights, options or warrants to purchase said shares of Common Stock, preferred stock or other capital stock of any type whatsoever that are, or may become, convertible into said shares of Common Stock or preferred stock, which cause the equity of the Company to be greater than 13,452,664 shares on a fully diluted and as converted basis.

-18-

**9.3    Procedure.**

(a)    In the event the Company proposes to undertake an issuance of New Securities, it shall give Purchaser written notice of its intention, describing the amount and type of New Securities, and the price and terms upon which the Company proposes to issue the same. Purchaser shall have fifteen (15) days from the date of receipt of any such notice to agree to purchase up to the maximum amount of such New Securities to which it is entitled under Section 9.1 for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased, and such transaction shall close no sooner than forty five (45) days thereafter.

(b)    In the event all of the New Securities are not elected to be purchased by Purchaser within fifteen (15) days of the notice pursuant to clause (a) above, the Company shall have ninety (90) days thereafter to sell the New Securities not elected to be purchased by Purchaser at the price and upon terms no more favorable to the purchasers of such securities than specified in the Company's notice. In the event the Company has not sold the New Securities within said ninety (90) day period, the Company shall not thereafter issue or sell any New Securities, without first giving notice and offering such New Securities in the manner provided above.

**9.4    Termination.**

The right of first refusal granted pursuant to this Section 9.0 shall terminate immediately following the closing of both a firm commitment underwritten public offering pursuant to an effective registration statement under the Securities Act having an aggregate offering price to the public of at least Thirty Million Dollars ($30,000,000) and the first secondary offering thereafter.

### 10.0  Connecticut Presence

**10.1    Relocation.**  At such time as the Company shall have moved its manufacturing operations to Connecticut in accordance with Section 6.5 (the "Relocation"), the Company shall not later relocate its manufacturing operations outside of Connecticut in breach of Section 6.5 ("Relocated").  Both parties acknowledge that the Company may add additional manufacturing operations after effecting a Relocation in accordance with Section 6.5, so long as (a) there is no relocation from Connecticut of, or reduction in the number of the Company's employees in Connecticut at, such Connecticut manufacturing operations, and (b) the Company has at least five hundred (500) full-time employees in Connecticut five (5) years after the Closing (the "Minimum Level").

-19-

**10.2    <u>Right to Put</u>.**  If the Company:

(a) shall not have effected the Relocation by September 25, 2003; provided, however, that the Company's obligation to have effected the Relocation by September 25, 2003 shall be suspended to no later than December 25, 2003, provided that during the period of such suspension the Company is making its best commercial efforts to effect the Relocation, or shall have breached its covenant in the last sentence of Section 6.5;

(b) shall, following the Relocation, relocate any material portion of its full-scale manufacturing operations or any employees directly engaged therein outside of Connecticut in breach of Section 6.5; or

(c) shall have failed to achieve the Minimum Level when required under Section 6.5;

then in any such case Purchaser shall have the right, by delivering to the Company (in the case of a failure under subsections 10.2(a) or (c), no later than sixty six (66) months after the Closing), a notice of Put (a "Notice of Put") in the form attached hereto as **<u>Exhibit C</u>**, to sell to the Company, and the Company agrees to purchase from Purchaser, in one or more transactions, the Shares for the Put Price (as defined below) and on the terms and conditions herein set forth (the "Put"); provided, however, that CII's right to Put by reason of the occurrence of an event described in subsection 10.2(b) shall be held in abeyance while the Minimum Level is being met, and at such time that the Minimum Level is not met, CII's Put right shall be immediately exercisable; provided, however, that the Minimum Level requirement shall be suspended during any "force majeure" event preventing the Company from complying therewith, so long as the Company is using best commercial efforts to promptly cure such event.

**10.3    <u>Put Closing</u>.**  The closing (the "Put Closing") of the purchase and sale of the Shares pursuant to this Section shall be held on the date (the "Put Date") which is the thirtieth (30th) business day after delivery of the Notice of Put. At the Put Closing, the Purchaser will deliver the Shares to the Company, and the Company will deliver to the Purchaser the Put Price for the Shares made the subject of the Notice of Put in cash, certified or bank check, or by wire transfer. If the Purchaser shall have sold less than all of its Shares, the Company shall deliver to the Purchaser a new certificate (as requested by the Purchaser), evidencing the Shares not made the subject of the Notice of Put.

**10.4**  **Definitions**.  For purposes of this Section 10.0:

"**Put Price**" means, at any date, the greater of:

>  (a) as to all Shares for which the Put is being exercised and which are then outstanding, the Current Market Value (as defined below) of each Share multiplied by the number of such Shares; or

>  (b) an amount equal to the aggregate amount of money paid by the Purchaser to the Company to purchase all of the Shares for which the Put is being exercised and which are then outstanding plus an amount calculated to yield an aggregate twenty-five percent (25%) annually compounded rate of return on such money from the date of each such payment to the date that the Put Price is paid to the Purchaser; and

"**Current Market Value**" as to a share of Class B Common Stock, shall mean on any date:

(a)    the average of the daily closing prices for the thirty (30) consecutive business days ending fifteen (15) business days before the day in question (as adjusted for any stock dividend, split, combination or reclassification that took effect during such 30 business day period) with the closing price for each day being the last reported sales price or, in case no such reported sales took place on such day, the average of the last reported bid and asked prices, in either case on the principal national securities exchange on which any Common Stock is listed or admitted to trading or as reported by Nasdaq (or if the Common Stock is not at the time listed or admitted for trading on any such exchange or if prices of the Common Stock are not reported by Nasdaq then such price as shall be equal to the average of the last reported bid and asked prices on such day as reported by The National Quotation Bureau Incorporated or any similar reputable quotation and reporting service, if such quotation is not reported by The National Quotation Bureau Incorporated); or

(b)    if the Common Stock is not traded in such manner that the quotations referred to in clause (a) above are available for the period required hereunder, the value determined in good faith by the Board of Directors of the Company or, if such determination cannot be made or is reasonably objected to by Purchaser within twenty (20) days of its notification thereof, by a nationally recognized independent investment banking firm (which has no past or present relationship with the Company or Purchaser) selected in good faith by the Board of Directors of the Company, or if such selection cannot be made or is reasonably objected to by Purchaser within twenty (20) days of its notification thereof, by a nationally recognized independent investment banking firm selected by the American Arbitration Association in Hartford, Connecticut in accordance with its rules.

-21-

**10.5    Termination.**  This Section 10 and CII's Put right shall terminate at such time as CII may sell all of the Shares pursuant to an effective registration statement under Section 5 of the Securities Act of 1933, as amended, or under Rule 144(k) promulgated thereunder or upon a merger of the Company in which CII receives all cash and/or marketable securities for the Shares.

## 11.0  Miscellaneous

**11.1    Further Assurances.**  The parties shall take such action and execute, or cause to be executed, such additional documents, before, on or after the Closing Date including without limitation, consents and acknowledgments, as may be reasonably necessary or desirable to effectuate the terms of this Agreement or to otherwise evidence the sale of the Shares to the Purchaser.

**11.2    Governing Law.**  This Agreement shall be governed in all respects by the laws of the Commonwealth of Massachusetts as applied to contracts made and to be fully performed entirely within such state between residents of such state.

**11.3    Survival.**  The representations, warranties, covenants and agreements made herein shall survive any investigation made by Purchaser or the Company and the closing of the transactions contemplated hereby.  All statements as to factual matters contained in any certificate or other instrument executed and delivered by or on behalf of the Company pursuant hereto or in connection with the transactions contemplated hereby shall be deemed to be representations and warranties by the Company hereunder as of the date of such certificate or instrument.

**11.4    Successors and Assigns.**  Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto; provided, however, that the right of the Purchaser to purchase the Shares shall not be assignable, except to an affiliate, without the prior written consent of the Company.

**11.5    Entire Agreement, Amendment.**  This Agreement and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and thereof. Neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by Purchaser and Company.

-22-

277250

**11.6    Notices, Etc.** All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given upon personal delivery or seven (7) days following deposit with the United States Post Office, by registered or certified mail, postage prepaid, addressed (a) if to Purchaser, at Purchaser's address as set forth in the preamble hereof, or at such other address as Purchaser shall have furnished to the Company in writing, with a copy to Updike, Kelly & Spellacy, P.C., One State Street, Hartford, CT 06103, to the attention of David E. Sturgess, or (b) if to the Company, at its address as set forth in the preamble hereof and addressed to the attention of Gary A. Mook, or at such other address as the Company shall have furnished to the Purchaser in writing, with a copy to Hutchins, Wheeler & Dittmar, 101 Federal Street, Boston, Massachusetts 02110, to the attention of Richard M. Stein.

**11.7    Delay or Omissions.** No delay or omission to exercise any right, power or remedy accruing upon any breach or default under this Agreement, shall impair any such right, power or remedy of the other party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of party of any breach or default under this Agreement, or any waiver on the part of such holder of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded, shall be cumulative and not alternative.

**11.8    Expenses.** The Company shall bear its own expenses and legal fees incurred on its behalf with respect to this Agreement and the transactions contemplated hereby. The Company will pay the reasonable legal fees and out-of-pocket expenses of the Purchaser and special counsel to the Purchaser with respect to this Agreement and the transactions contemplated hereby.

**11.9    Aggregation.** Shares of capital stock of the Company owned by partnerships and corporations having substantially common ownership interests or managed by the same principals and owned by individual investors affiliated with one another will be aggregated for the purposes of calculating the aggregate percentage of capital stock of the Company owned by Purchaser and any permitted transferee hereunder.

**11.10    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the party actually executing such counterparts, and all of which together shall constitute one instrument.

**11.11    Severability.** In the event that any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision; provided, however, that no such severability shall be effective if it materially changes the economic benefit of this Agreement to any party.

-23-

**11.12  Arbitration.**  Any dispute, controversy or disputed claim arising under, in connection with or relating to, this Agreement, as well as any amendment, purported amendment or termination, or any breach or violation thereof, shall be finally settled and determined under and pursuant to the applicable commercial arbitration rules and procedures of the American Arbitration Association.  The arbitration shall be held at Boston, Massachusetts.  The arbitrator(s) shall have no affiliation or relationship with either Party or their counsel and, when feasible, shall have training or experience in the subject matter of the dispute.  Any award or decision rendered pursuant to such rules and procedures shall be final and binding on each of the Parties hereto and their respective successors and assigns.  Such decision or award shall be in writing signed by the arbitrator(s) and shall state the reasons upon which the decision or award is based. Judgment on any decision or award pursuant hereto may be entered in any court having jurisdiction thereof.

**11.13  Public Disclosures.**  The Purchaser and the Company shall issue a mutually agreeable press release regarding the transactions contemplated hereby.

**11.14  Connecticut Employment.**

(a)  The Company shall furnish to Purchaser upon request, copies of the quarterly reports filed by the Company and any of its subsidiaries with the Connecticut Department of Labor, employment records and such other personnel records to the extent permitted by law as Purchaser may reasonably request to verify the creation or retention of Connecticut employment.

(b)  The Company hereby authorizes Purchaser to examine, and will at any time at the request of Purchaser provide Purchaser with such additional authorization satisfactory to the Connecticut Department of Labor as may be necessary to enable Purchaser to examine all records of said Department relating to the Company and/or any of its subsidiaries.

**11.15  Equal Opportunity.**  The Company agrees and warrants that it is an equal opportunity employer and that it does not discriminate.  The Company further agrees and warrants that, in connection with its Connecticut operations:

(a)  The Company will not discriminate or permit discrimination against any employee or applicant for employment because of sex, sexual orientation, race, color, religious creed, age, marital status, mental retardation, physical disability, national origin, or ancestry. Such action shall include, but not be limited to, the following: employment upgrading, demotion or transfer; recruitment advertising; lay-off or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

(b)  The Company agrees to take affirmative action to insure that applicants with job-related qualifications are employed.

(c)  The Company will, in its solicitation for employees, state that it is an "affirmative action-equal opportunity employer."

(d) The Company agrees to provide each labor union or representative of workers with which the Company has a collective bargaining agreement or other contract or understanding and each vendor with which the Company has a contract or understanding, a notice to be provided by the Commission of Human Rights and Opportunities (the "CHRO") and to post copies of the notice in conspicuous places available to employees and applicants for employment.

(e) The Company agrees to cooperate with Purchaser, the State of Connecticut and/or any of its agencies and the CHRO to insure that the purpose of this equal opportunity clause is being carried out.

(f) The Company agrees to comply with all relevant regulations and orders issued by the CHRO, to provide the CHRO with such information as it may request, and to permit the CHRO access to pertinent books, records, and accounts concerning the contractor's employment practices and procedures.

(g) The Company agrees to comply with all of the requirements set out by Sections 4a-60 and 4a-60a of the Connecticut General Statutes, as it may be amended.

(h) The Company agrees to post a notice of this acceptance of the foregoing equal employment opportunity provisions at its place of business in Connecticut, clearly visible, in such form as is satisfactory to Purchaser.

[balance of page intentionally left blank – signature page follows]

277250

[signature page to Class B Common Stock Purchase Agreement]

**IN WITNESS WHEREOF,** the undersigned have executed this Common Stock Purchase Agreement as of the date first written above.

**ACUMENTRICS CORPORATION**

By: _____
    Gary A. Mook
    Its President and Chief Executive Officer

**CONNECTICUT INNOVATIONS, INCORPORATED**

By: _____
Its Executive Vice President and COO

277250

## SUPPLIER AGREEMENT

This Agreement made and entered into this 25th day of March, 2002, by and between

Acumentrics Corporation, a Massachusetts corporation with its principal place of business in

Westwood, Massachusetts (the "Company") and Connecticut Innovations, Incorporated, a

Connecticut corporation with its principal place of business in Rocky Hill, Connecticut (the

"Customer").

### WITNESSETH:

WHEREAS, the Company is developing and commercializing various fuel cell products

(collectively the "Products"), and desires to market and sell such Products upon

commercialization;

WHEREAS, the Company desires to develop and commercialize larger and more

powerful Products and the Customer desires to assist the Company in the development of such

larger and more powerful Products by purchasing such Products from the Company; and

WHEREAS, the Customer desires to purchase Products from the Company once such

Products are commercialized and the Company is willing to sell such Products to the Customer,

all in accordance with the terms and conditions contained herein;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants

contained herein, the parties hereto hereby agree as follows:

1.0    Purchase and Sale

1.1    The Customer shall purchase, and the Company shall sell, each of the three (3)

Products listed in Exhibit A attached hereto and the Customer shall purchase such additional

Products, from among all Products offered by the Company, as shall bring the total Product

purchases hereunder to Products that can provide at least 750 Kilowatts for a total value of at

least Three Million Dollars ($3,000,000) of Products, all in accordance with the terms and conditions hereof, including, without limitation, the terms and conditions contained in Exhibit B attached hereto.  Such additional Products shall be ordered at least ninety (90) days prior to the desired delivery date and shall be the subject of good faith negotiations between the parties prior to the issuance of orders therefor as to the terms of such purchases that are not specified herein.

    1.2    The Customer shall receive the first of each Product described in Exhibit A sold by the Company.  The Company shall keep the Customer informed regarding its progress, including with written quarterly reports.  If any Product is not delivered within 45 days after the delivery date specified in Exhibit A for such Product, then the Customer shall have the right to cancel such delivery by written notice to the Company made prior to such delivery.

    1.3    All Products sold to the Customer shall be manufactured by the Company in Connecticut and shall have a F.O.B. point in Connecticut as specified by the Customer.  The Customer shall not resell any Products without the Company's consent, which consent shall not be unreasonably withheld or delayed.

    1.4    Customer shall acquire each Product free and clear of all judgment liens, mechanic's liens, leases, security interests and any other right to, or interest in, such Product.

    1.5    The Company shall provide Customer and/or its agents and assignees with any licenses (which shall be without royalty or any other charge) necessary for Customer to use and/or operate any software or other intellectual property associated with the operation or use of the Products.

2.0    <u>Prices and Payment</u>

2.1    Products ordered by the Customer hereunder will be invoiced at Four Dollars ($4.00) per Watt produced by the Product (e.g., a 50 Kilowatt Product will be invoiced at $200,000). The Customer shall have the right to have the invoice price for any Product reduced if the Company shall have received less than Four Dollars ($4.00) per Watt for any comparable product sold to any other party within 180 days after the sale of such Product to the Customer, the price of such third party sale to be adjusted to reflect a comparable configuration and set-up for the product as compared to the applicable Product (but without increase for installation charged to a third party), and the Company shall promptly make any cash payment to the Customer if necessary to effect such reduction.

2.2    Promptly following written notice from the Company to the Customer of the execution by the Company and its landlord of a lease (the "Lease") for a facility (the "Facility") for the Company to engage in full-scale manufacturing of its products in Connecticut (the "First Payment Date"), the Customer shall pay the Company an advance payment in the amount of $900,000 (the "First Payment"), against the price of all Products to be purchased hereunder. Such advance payment shall be credited by the Company against Product invoices issued pursuant to Section 5 of Exhibit B on a dollar-for dollar and first invoices delivered basis. In order for the First Payment Date to have occurred, the Lease shall:

(a)    cover not less than 50,000 square feet of leased space;

(b)    be unconditional to the landlord except for commercially standard exceptions;

(c)    be on commercially reasonable terms to the Company;

(d)    have a minimum term of not less than ten (10) years;

-3-

(e) not deal with any other matters other than the leasing of the Facility and provisions related thereto; and

(f) otherwise be on terms reasonably satisfactory to Customer.

If the First Payment Date shall not have occurred by March 31, 2004, then the Customer shall have the right at any time thereafter, but prior to the First Payment Date having occurred, to terminate this Agreement by written notice to the Company, in which case this Agreement shall be of no further force or effect and no party shall have any further obligation or liability to the other party.  Promptly following written notice from the Company to the Customer of the issuance of a permanent certificate of occupancy for the Facility (the "Second Payment Date"), the Customer shall pay the Company an advance payment in the amount of $600,000 against the price of all Products to be purchased hereunder.  Such advance payment shall be credited by the Company against Product invoices issued pursuant to Section 5 of Exhibit B on a dollar-for-dollar and first invoices delivered basis.  If the Second Payment Date shall not have occurred by September 30, 2004, then the Customer shall have the right at any time thereafter, but prior to the Second Payment Date having occurred, to terminate this Agreement by written notice to the Company, in which case the Company shall promptly refund the First Payment to the Customer and this Agreement shall be of no further force or effect and no party shall have any further obligation or liability to the other party.

### 3.0    Approval of Product

Company shall notify Customer when it has completed the development of each Product listed in Exhibit A so that such Product is then available for commercial sale.  Company shall also make the Products available for sale and any no-cost test results relating thereto available for evaluation by Customer.  Customer shall notify Company if it determines, after such

-4-

evaluation, that the Products do not conform to the specifications in Exhibit A and such other specifications as are mutually and in good faith agreed to by the parties, or are otherwise not merchantable. Upon receipt of such notice, Company shall make commercially reasonable efforts to correct any defects identified by Customer.

### 4.0    Permits; Compliance with Laws

Company shall, at its sole cost and expense, obtain and maintain in full force and effect throughout the term of this Agreement all consents, licenses, approvals and permissions necessary to enable it to lawfully develop and supply the Products hereunder. In performing its obligations hereunder, Company further agrees to comply at all times with all applicable laws, regulations and health and safety standards.

### 5.0    Installation

The Company shall use reasonable efforts to install each Product at no charge at a reasonably selected site in Connecticut designated by Customer. Installation shall include:

(a) supplying and installing all electrical connections and control wiring;

(b) furnishing and supplying all plumbing connections;

(c) taking all proper steps and precautions to protected and secure the Product from damage due to adverse weather; and

(d) connecting the Product to electrical supplies and installing transformers, metering equipment, circuit protection devices and controls.

### 6.0    Check-out and Start-up; Training; Manuals; Other Equipment

6.1    The Company shall provide Customer at no charge with checkout of the installation and initial startup of each Product, where "checkout" includes maintenance service from when installation is concluded until the Product has demonstrated successful initial

-5-

operation over a sustained operating period in conformance with its specifications ("Initial Success").

6.2    The Company shall provide Customer at no charge with appropriate training for each Product installation and operation.

6.3    The Company shall furnish to Customer at no charge installation and service manuals prior to or upon delivery of each Product and provide updates to Customer of all installation and service manuals when such updates are made.

6.4    For the term of the Product warranty, the Company shall furnish and install at no charge any and all other equipment, consumables and merchandise necessary for the operation of each Product and not otherwise explicitly required hereunder to furnished or installed by Customer.

7.0    <u>Indemnification</u>

7.1    Company agrees to indemnify and hold harmless Customer and its Affiliates and all end-users and their officers, directors, employees, and agents from and against any and all claims, judgments, damages, losses, liabilities, costs, expenses (including attorneys' fees) incurred by any of them relating to or arising out of or in connection with the Products as supplied by Company under this Agreement, including without limitation any claims that the Products infringe the patent, copyright, trade secret or other intellectual property or proprietary right of any third party, and any product liability claims (including claims of strict liability) relating to the Products.  Company's obligation to indemnify Customer hereunder shall not apply to the extent that such claims arise from: (a) any modifications to the Products made by Customer without Company's prior consent; (b) Customer's use of the Products in connection with products that are not specified by Company; or (c) Customer's failure to provide the end-

-6-

users with the Product warranty and disclaimer terms to be determined as contemplated by

Section 6.0. The Customer agrees to promptly inform the Company of the existence of any

matter the Customer asserts to be covered by this Section 7.0, and agrees to the furnish the

Company all information and assistance in connection therewith which may be reasonably

requested by the Company from time to time. The Company shall have the sole right to settle,

defend or otherwise handle any such claim.

7.2    The indemnities in this Section 7.0 shall survive for a period of five (5) years

following Product delivery.

7.3    NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY OR ANY

THIRD PARTY FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, SPECIAL OR

PUNITIVE DAMAGES OF ANY KIND – INCLUDING LOST GOODWILL, LOSS PROFITS,

LOST BUSINESS OR OTHER INDIRECT ECONOMIC DAMAGES, WHETHER SUCH

CLAIM IS BASED ON THEORIES OF CONTRACT, NEGLIGENCE, TORT, OR

OTHERWISE, ARISING OUT OF ANY BREACH OF THIS AGREEMENT, REGARDLESS

OF WHETHER SUCH PARTY HAD REASON TO KNOW OR IN FACT KNEW OF THE

POSSIBILITY OF SUCH DAMAGES.

8.0    Warranty and Maintenance

Upon reaching agreement on the specifications for the Products to be supplied hereunder,

the parties shall negotiate in good faith the provisions of a commercially reasonable warranty and

disclaimer terms for the Products that Company will offer to Customer and that Customer will

provide to the end user. During that same time period, the parties will negotiate in good faith a

service contract for post-warranty maintenance of the Products. As of the date of this

Agreement, it is contemplated that Customer shall provide reasonable onsite customer service

-7-

and support during the post-warranty period, and Company shall provide reasonable training and support to Customer regarding service, installation, maintenance, repair and non-proprietary product education.

### 9.0     Confidential Information

9.1     As used in this Agreement, the term "Confidential Information" with respect to each party hereunder means all non-public ideas, concepts, processes, techniques, inventions, data, testing, business plans, marketing plans, market research, test data and other non-public information owned or controlled by a party and disclosed to the other party in connection with this Agreement. In no event, however, shall "Confidential Information" include any information that: (a) is or becomes publicly known or publicly available or otherwise in the public domain through no fault of the receiving party; (b) is already known to the receiving party at the time of disclosure; (c) is independently developed by the receiving party without the use of the information provided by the disclosing party; (d) is received by the receiving party from a third party under no obligation of confidentiality to the disclosing party; or (e) is required to be disclosed by order of court or governmental agency or to the Connecticut legislature and/or its committees or agents or to other persons, as required by statute, regulation or otherwise or if so ordered or requested; provided, however, that in such a case, such party shall use its best efforts to notify the other party of such order in sufficient time for the parties to seek a protective order or other appropriate relief.

9.2     Each party agrees to keep the other party's Confidential Information in confidence and further agrees not to disclose it to any third party except as reasonably required to perform its obligations under this Agreement.

-8-

10.0   <u>Miscellaneous Provisions</u>

10.1   The rights and obligations of either party hereunder may not be assigned or transferred in whole or in part without the prior written consent of the other party and any attempted assignment without such consent shall not be valid or binding on the non-assigning party; provided, however, that either party may assign this agreement to an affiliate or to a successor or to the purchaser of substantially all of the assets of the business to which this Agreement pertains without the other party's prior written consent. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

10.2   This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

10.3   All notices given hereunder shall be in writing and sent by certified mail, return receipt requested, to the following addresses, provided that a party may change its notice address by furnishing notice thereof:

|  |  |
|---|---|
| If to Customer: | Connecticut Innovations, Incorporated<br>999 West Street<br>Rocky Hill, Connecticut 06067<br><br>Attn: President |
| If to Company: | Acumentrics Corporation<br>14 Southwest Park<br>Westwood, MA 02090-1524<br><br>Attn:   Gary A. Mook, President and CEO |

10.4   The failure of a party at any time to enforce any provision of this Agreement shall not constitute a subsequent or continuing waiver thereof.

277250

10.5    The headings of this Agreement have been inserted for convenience of reference only and are to be of no force or effect in any construction or interpretation of the provisions hereof.

10.6    Exhibits A and B are hereby incorporated herein by reference and made a part hereof.

10.7    If any provision of this Agreement shall be held to be invalid or unenforceable, such determination shall not affect the remaining provisions of this Agreement and, this Agreement shall remain in full force and effect, and any invalid or unenforceable provision shall be enforced to the maximum extent legally permissible.

10.8    This Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes any prior or contemporaneous agreements and understandings in connection therewith.  This Agreement may be amended or revoked only by a written instrument executed by both parties hereto.

[balance of page intentionally left blank – signature page follows]

277250

[signature page to Supplier Agreement]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal in duplicate originals through their respective duly authorized officers as of the date first written above.

**ACUMENTRICS CORPORATION**

By: _____
Gary A. Moore
Its President and Chief Executive Officer

**CONNECTICUT INNOVATIONS, INCORPORATED**

By: _____
Arnold B. Brandyberry
Its Executive Vice President and
Chief Operating Officer

277261